[No. 14847.   In Bank.—January 5, 1894.]

# NATOMA WATER AND MINING COMPANY, RE-SPONDENT, *v.* JOHN HANCOCK ET AL., APPEL-LANTS.

WATER RIGHTS—APPROPRIATION—TAPPING POND OF PRIOR APPROPRIATOR FOR SURPLUS WATER—INJUNCTION.—A prior appropriator of the water of a stream, who constructs a dam across the bed of the stream for the purpose of raising its surface to a level which will cause it to flow into his ditch, does not thereby acquire such an exclusive right in the bed and banks of the stream, as far as the slack water extends above his dam, in the form of a pond or pool, that he can enjoin a subsequent appropriator of the surplus water from tapping the stream and divert-ing the surplus at a point above the dam and below the head of the slack water in such pond or pool, if he does not interfere with the free use and enjoyment of the water right or the property of the prior appro-priator.

ID.—POWER TO DRAIN DITCH.—The subsequent appropriator cannot be enjoined from appropriating the surplus water at a point above plain-tiff's dam merely because he thereby has the power to drain plaintiff's ditch or canal, if he disclaims any such intention.

ID.—INCONVENIENCE TO PRIOR APPROPRIATOR—DAMNUM ABSQUE INJURIA.—The prior appropriator is bound to use reasonable care to avoid unnecessary waste of the surplus water appropriated by the subsequent appropriator, at a point above his dam, and the inconvenience caused by the lowering of his head of water by the diversion of the surplus, and by his being compelled to raise the crest of his dam earlier in the season, and to make it tight and efficient so as to prevent waste of surplus water, oftener than he had been accustomed to do, is *damnum absque injuria.*

ID.—ENLARGEMENT OF DITCH—PRESCRIPTION—ADVERSE USER—ACQUIES-CENCE—ESTOPPEL.—Where the rights claimed by subsequent appropri-ators of water above the dam of a prior appropriator have not been interfered with by the enlargement of the ditch of the prior appropri-ator, and the box used by the subsequent appropriator in diverting the water to which they were entitled was not closed after such enlarge-ment, the use of the enlarged ditch is not adverse, and no rights are acquired thereby through the acquiescence of the subsequent appropri-ators in the use of the enlarged ditch, and no estoppel is thereby raised against them.

ID.—CONTRACT BETWEEN APPROPRIATORS—MEASURE OF RIGHTS.—Water rights held under a contract between prior and subsequent appropriators are to be measured by the terms of the contract, if not modified by acquiescence in adverse user, or the acquisition of a prescriptive right.

APPEAL from a judgment of the Superior Court of Sacramento County, and from an order denying a new trial.

The facts are stated in the opinion of the court.

*Barclay, Wilson & Carpenter, S. Solon Holl,* and *J. G. Blanchard,* for Appellants.

*Daniel Titus,* for Respondent.

BEATTY, C. J.—This is an action to enjoin the appellants from diverting water from the South Fork of the American river at a point immediately above the dam of the respondent, and the principal question involved in the case may be stated as follows: If a prior appropriator of water constructs a dam across the bed of a stream for the purpose of raising its surface to a level which will cause it to flow into the head of his ditch, does he thereby acquire such an exclusive right in the bed and banks of the stream as far as the slack water extends above his dam that he can enjoin a subsequent appropriator of the surplus from tapping the stream, and diverting such surplus at any point above the dam and below the head of the slack water?

The decree of the superior court, from which the defendants appeal, cannot be sustained without affirming this proposition, as will clearly appear from a statement of the case.

The South Fork of the American river is a considerable stream heading in the high Sierras, and like other mountain streams varies greatly in volume from year to year, and from season to season. It reaches its lowest stage in each year towards the end of the dry season, and when the rains begin (usually in the fall) its flow increases in proportion to the amount of precipitation. Ordinarily it reaches its highest stages during the winter and early spring, at which period it is subject to heavy floods. After the rains cease in the spring its volume subsides, but its flow is maintained by the melting snows at a comparatively high stage until the latter part of the summer. These are features common to all the streams flowing from the Sierras to the Sacramento valley and are matters of universal notoriety. Such being the case,

it is evident that an appropriation covering the entire flow of the stream at its lowest stages may leave a large surplus of water at flood, or even ordinary stages.

The plaintiff in this case in the year 1851 gave notice of its intention to divert and appropriate, for the purpose of placer mining and irrigation, enough of the waters of the South Fork to fill at all times a canal eight feet wide and four feet deep, with a current running ten miles per hour. In pursuance of this notice it proceeded to construct a canal ten or fifteen miles in length, but not of the capacity mentioned in its notice. Its present capacity, as found by the court, is six feet wide at the bottom, eight feet wide at the top, three feet deep, and with a grade or fall of four feet to the mile. In seasons when the water has been unusually low in the dry summer months, the capacity of the canal was sufficient to take all the water of the river, but ordinarily, at the lowest stages of the stream, considerable quantities of water are discharged over the dam after the canal is filled.

The system of headworks by which the plaintiff diverts water from the river is of the ordinary type. The upper section of the canal, for a distance of about three hundred yards, is of considerably greater capacity than the canal proper, and is furnished with waste-gates and sand-gates for the discharge of silt and surplus water. At the lower end of this larger section, and at the head of the canal proper, is a gate by which the influx of the water is controlled. By means of a dam across the stream, a short distance below the head of the canal, the water is raised to the proper level to fill it. This dam, which is of stone, is about three hundred feet long on its crest. Neither the findings nor the evidence show what its height is; but, according to the only testimony on the point, it sets back the water about three-quarters of a mile—say three thousand feet, or ten times the width of the dam, and twenty times the mean width of what plaintiff calls its pond. The crest of the dam is about ten inches lower than the level at which the

water must be held in order to turn a full supply into the head of the plaintiff's canal, and it appears from the evidence that the dam cannot be made permanently higher without endangering the head of the canal and its banks in times of flood. Ordinarily the amount of water flowing in the stream is so large that the permanent dam holds it at a sufficient height for plaintiff's purposes; but as the water falls with the advance of the dry season, and especially during years of extraordinary scarcity, it is necessary to add a false crest of lumber, or riprap and gunnysacks, by which the dam is raised so as to prevent any water from passing over it.

Disregarding some minor facts and some qualifications which it will be more convenient to state in connection with another branch of the case, it may be said that the foregoing statement applies to the whole period of time from the completion of the plaintiff's dam and ditch in 1852 or 1853 down to the trial of this action. The plaintiff has at all times diverted water to the full capacity of its canal, and applied the whole of it to beneficial uses for mining and irrigation. It still requires, for irrigation and other useful purposes, all the water so diverted, and, as against a subsequent appropriator, has an undoubted right to continue such diversion unmolested and undisturbed, except in so far as a lawful appropriation and diversion of the surplus at a point above its works may involve the necessity of altering and perfecting the appliances which have thus far proved sufficient to fill its ditch.

The question is, whether it is any infringement of this right of plaintiff for the defendants, in order to appropriate the surplus and divert it to an irrigating ditch on the opposite side of the river, to tap the stream above the dam and below the head of the slack water?

There can be no question as between the parties to this action that the defendants have a perfect right to appropriate such surplus by any lawful means of diversion; and the only question is whether the plaintiff can shut them out from access to the stream at all points

between the upper and lower ends of what counsel call its pond.

The plaintiff's canal is on the south side of the river. The defendants, or some of them at least, are successors in interest to the owners of a mining and irrigating ditch on the north side which was originally constructed and used as early as 1854, and was known as the Boyd's Bar ditch. In March, 1854, the plaintiff entered into a written agreement with the proprietors of the Boyd's Bar ditch, by which it granted to them the right to "put in, insert, and maintain in the dam of said Natoma Water and Mining Company" a box of sufficient size to supply their ditch, reserving the right, in case of a deficiency of water to fill its own canal, to close the gate of the Boyd's Bar ditch, and keep it closed while such deficiency continued.

In pursuance of this agreement the predecessors of defendants put in a box two feet square on the north side of the river, and a few feet above plaintiff's dam, through which they have ever since drawn water to supply their ditch. In 1887 the defendants posted a notice of their intention to enlarge their ditch to a capacity of two thousand inches, the diversion to be made at the Natoma dam. In accordance with this notice they had completed the proposed enlargement up to within a short distance of the dam when this action was commenced for the purpose of enjoining them from "completing the construction of said ditch, and tapping the said South Fork of the American river at the plaintiff's dam, and from taking water therefrom or from any point above said dam," etc. The enlarged ditch of defendants was of sufficient capacity to carry all the water of the South Fork at its lowest stages in a dry year, and its level being some ten inches lower opposite the dam than that of plaintiff's canal, it would have been *in the power* of the defendants, upon the completion of their ditch, to drain the stream, and deprive plaintiff of all or of a great part of the water to which it is entitled.

But they have at all times disclaimed any intention

of taking any but the surplus water over and above the quantity to which the plaintiff is entitled by its prior appropriation. In their posted notice of intention they say nothing about surplus water, but by their answer to the complaint in this action, by their testimony at the trial, and by their declarations pending, and prior to the commencement of, the action, they have uniformly insisted that they have no intention to divert any but the surplus water.

There is no finding that they have any other intention, and no evidence upon which such a finding could be sustained. The court, however, does find that "in order to draw the surplus from plaintiff's dam without taking the water from plaintiff's canal, it would be necessary to raise plaintiff's dam from twenty-two to twenty-four inches higher, and also to raise the banks of plaintiff's canal." This finding, and the fact that defendants, upon completion of their ditch, would *have the power* to drain plaintiff's canal, are the sole grounds upon which the superior court has enjoined the defendants from completing their ditch, and it only remains to consider whether they are sufficient to uphold the decree.

It is to be observed, in the first place, that the defendants are not in any worse position than they would be if they had not succeeded to the rights of the original owners of the Boyd's Bar ditch under the contract of 1854. Claiming, as they do, the privilege granted by that contract, they must concede, as they do concede, the prior right of the plaintiff to all the water carried by its canal at the date of the contract, but as to the surplus, they stand upon the same footing as other citizens, and may, like others, appropriate it by any lawful means. This, indeed, is not disputed, and the contention of counsel here is for the identical proposition enunciated in the findings and conclusions of the superior court; that no subsequent appropriator can tap the stream above the dam and within the slack water, because if he did it would be *in his power* to drain plaintiff's

canal, and even if he strictly limited his diversion to the actual surplus it would compel the plaintiff to raise its dam and the banks of its canal. As to this last finding, it is not sustained by the evidence, because, although there is some slight testimony to that effect, it is contrary to reason.

The findings, no less than the evidence, show that there are times when the river carries barely enough water to fill plaintiff's canal. At such times it is necessary to raise the dam by means of a false crest of riprap and gunnysacks high enough, and to make it tight enough, to prevent any water from flowing over or leaking through. The diversion of the surplus at any stage of the river would impose upon the plaintiff the necessity of doing nothing beyond what it is accustomed to do when from natural causes the surplus gradually diminishes and fails. It would simply have to raise its dam by a false crest, and make it tight enough to prevent any waste. The diversion of a part of the surplus would require a proportionate addition to the crest of the dam, and the whole effect of any diversion above the dam would be to compel the plaintiff to commence the annual operation of building a false crest a little earlier in the season than it has been accustomed to do, and to make it high enough and tight enough to prevent any waste during some years, when, without such diversion, a less efficient crest would serve to fill its canal. This is as plain and self-evident as the proposition that two and two make four, and testimony to the contrary is not worthy of consideration.

The question to be decided, therefore, narrows itself to this: Must the defendants be enjoined from tapping the stream merely because they would thereby gain the power to drain plaintiff's canal, though they disclaim any such intention; or must they be enjoined from diverting the surplus merely because such diversion would compel the plaintiff to perform its annual task of raising its dam earlier in the season every year, and of

making it tight and efficient oftener than they have been accustomed to do ?

To answer either of these questions in the affirmative would be equivalent to holding that there never can be a lawful appropriation of the surplus at any point above the plaintiff's dam. For it is self-evident that a ditch heading in the stream above the slack water with a dam sufficient to fill it would give its proprietors the same, or even more complete, power to drain plaintiff's canal, than a ditch heading in the slack water, and it is equally evident that a diversion of the surplus, or a portion of it, at any point above the head of plaintiff's ditch would lower the head of water behind the dam to precisely the same extent that it would be lowered by a diversion of the same quantity from the slack water. It is apparent, therefore, that there is nothing in either of the two grounds upon which the injunction was sought and granted, and upon which it is defended here, that would not equally support a similar decree, if the defendants, instead of seeking to put the head of their new ditch in plaintiff's so-called pond, had gone a mile above the head of the slack water for that purpose. But, as above remarked, there can be no question as to the right of any lawful appropriator to divert the surplus either above or below the plaintiff.

Suppose the defendants had headed their new and enlarged ditch from a point on the stream entirely above plaintiff's slack water, and an injunction had been sought upon either or both of the grounds I have been discussing.

As to the control they would thereby acquire over the flow of the stream, and the mere power it would give them to drain plaintiff's canal, the obvious answer would be: The defendants have as perfect a right to appropriate the surplus as you have to the quantity first appropriated. They can take it either above you or below you, as their interest or convenience may dictate. They choose to take it above. They cannot divert the

CI. Cal.—4

surplus without putting in a dam and ditch, and, therefore, the right to the surplus involves the right to the dam and ditch. It may be true that their dam and ditch will put it in their power to take all the water when the stream is low, and thereby drain your canal; but it does not follow that they will make such unlawful use of their power. They disclaim any intention of doing so. Necessarily they will be compelled to provide their ditch with a proper head-gate, and other suitable appliances for controlling the influx of water, and when the stream falls they can readily limit or shut off the flow into their ditch so as always to leave you the quantity to which you are entitled. In the mean time they cannot be enjoined from using the means essential to the exercise of their undoubted right merely because they would thereby gain the power to infringe yours. It will be time enough to enjoin them when they threaten or attempt to injure you, and the powers of a court of equity are entirely adequate to the conservation and enforcement of the rights of both parties. If the defendants fail to provide their ditch with proper head-works and you are thereby deprived, or threatened with the deprivation, of any of the water by you first appropriated, an injunction specifically framed to meet the case will compel the defendants to provide suitable works, and to exercise their rights in such manner as to leave yours unimpaired.

As to the necessary lowering of your head of water by the diversion of the surplus, that will no doubt cause you some inconvenience and trouble which you have heretofore escaped, but it is *damnum absque injuria.* There is but a limited supply of water in this state available for irrigation and other useful purposes, and a paramount public policy requires a careful economy of that supply. So long as there is but a single appropriator of water on a stream it matters not how imperfect or wasteful may be the means by which he diverts the quantity of water to which he is entitled. No one else is affected, and there is no ground for complaint.

But when subsequent appropriators divert the entire surplus at points above him he is required to use all reasonable diligence to husband what is left, and if by such diligence and the use of ordinary means of diversion he can obtain all that he is entitled to he cannot complain on account of the trouble and expense which it may involve.

In the case of *Barrows* v. *Fox*, recently decided (98 Cal. 63), we had occasion to consider this policy of the law of appropriation and to apply its principle. There a riparian owner of lands below the point at which a portion of the stream had been diverted by a prior appropriator, sought and obtained an injunction which in effect required the appropriator to substitute an iron pipe in place of his ditch and flume in order that he might receive the quantity of water he could put to a beneficial use without diverting so large a quantity from the stream. We held that the decree was in this respect erroneous, because ditches and flumes are the usual and ordinary means of diverting water in this state, and parties who have made appropriations by such means cannot be compelled to substitute iron pipes, " *though they may be compelled to keep their flumes and ditches in good repair so as to prevent any unnecessary waste.*" Accordingly, we decided that the appropriator had a right to divert from the stream water enough to yield at the place of use the quantity required after the loss by absorption and evaporation. of so much thereof as is necessarily so lost in a ditch and flume *well constructed and kept in good condition.*

This is but the latest of a long series of decisions recognizing and enforcing the same policy; and the soundness of the doctrine upon which they rest is unquestioned.

While the right of the prior appropriator is carefully protected, he is compelled to exercise it with due regard to the rights of others and the paramount interests of the public. The quantity of his lawful appropriation cannot be diminished, but he must return the surplus

to the stream without unnecessary waste, and he must use reasonable diligence and reasonably efficient appliances in making his diversion in order that the surplus may not be rendered unavailable to those who are entitled to it.  Upon the same principle it must be held that a prior appropriator whose means of diversion become insufficient for his purposes, by reason of their inherent defects, when the surplus is diverted above him, must take the usual and reasonable measures to perfect such means.  And it is no injustice to this plaintiff to allow the diversion of the surplus waters of the South Fork by a lawful appropriator, so long as a resort to the same means it is accustomed to employ in periods of scarcity will enable it to fill its canal.

Having thus, as I think, clearly shown that the doctrine upon which the decree of the superior court is expressly based, and upon which counsel seek to uphold it, involves the absurd conclusion that the surplus waters of the South Fork cannot be diverted by a qualified appropriator at any point above the head of plaintiff's canal, I will next consider some of the more technical grounds upon which counsel base their further contention.

They seem to claim that, irrespective of any question of actual injury to the plaintiff by a diversion of the surplus, and conceding that it will cause no greater or other inconvenience to take it from the dam than would be occasioned by taking it from the stream above the dam, the plaintiff has, nevertheless, such an exclusive property in the bed and banks of what they call its pond or reservoir, that to take it from the dam would be an invasion of its strict legal rights—a trespass upon its property.  Indeed, the argument of counsel is that they have the same right to the pond that they have to their canal, and if the defendants can put the head of their ditch in the former, they can with equal right put it into the latter.  But clearly this is not so, for in the absence of any proof of title derived from a paramount source there is an obvious and radical difference

between the canal and the river. The plaintiff made the canal, its bed, and banks; it did not make the channel of the river. It has been permitted for its convenience to obstruct the flow of the river; to raise its level, and, necessarily, to retard its current, and to widen and deepen it above the dam, but this change in its condition leaves it still a part of the river, and it is difficult to see how those who had a right of access to it before plaintiff's dam was erected have lost such right merely because, by the liberality of the government, the plaintiff has been permitted to raise its level and set back its current.

There is no finding as to the ownership of the soil covered by the dam or either of the ditches. Nor is there any evidence, so far as I can discover, touching the point. In the absence of proof to the contrary, it must be assumed that these lands are public lands of the United States, as they unquestionably were at, and long after, the time when plaintiff constructed its dam and canal and made its appropriation. The rights of plaintiffs are, therefore, such as have been conferred by the grant or license of the United States. The extent of this grant or license is clearly defined by the act of Congress of July 26, 1866. It confirms such rights to the use of water as have been recognized and acknowledged by local laws and customs and the decisions of courts, and grants a right of way for ditches and canals. (14 Stats. at Large, 253.) It does not grant any land whatever, but merely the right to divert and use the water, and a right of way—an easement. There is nothing in the letter of the statute, or the terms of the grant, which authorizes the erection of a dam across a natural stream, but assuming that the grant of the water right carries with it the right to employ this reasonable and usual means of forcing the water into the canal, it cannot be held to carry anything not necessary to the enjoyment of the right granted, nor to deprive the government of such control of the stream as is essential to the protection of other equally deserving

objects of its bounty.    To say that the first appropriator gains an exclusive right of access to the river as far above his dam as it sets the water back, is to say that he takes as an incident to what is expressly granted, something that is in no way essential to the enjoyment of his rights, but is in the highest degree prejudicial to the government by whose liberality he profits, and to all other citizens who may desire to participate in its bounty upon fair and equal terms.

Suppose that the land covered by this dam has been granted, or shall hereafter be granted, by the United States to homestead or pre-emption claimants, will anyone contend that such grantees have taken, or will take, it subject to any right of plaintiff, except the mere easement to flow it?    It does not seem possible that there can be but one answer to this question.    As against the United States, and those who connect themselves with the United States, the plaintiff does not own a foot of land covered by its so-called pond, or bordering upon it.    If the land still belongs to the United States the defendants are granted, by the same statute under which plaintiff claims, a right of way across it to the river for the purpose of making a lawful appropriation of any water not covered by a prior right, and the plaintiff, by raising the level of the river, has not sequestered one foot of its natural channel, except so much as is covered by the material structure of its dam, or is essential to its support.

To call this inclosure formed by the dam and the sides of the cañon a reservoir is an abuse of terms.    A reservoir may be formed by damming a natural watercourse where the object is the storage of a large body of water; but the object of this dam is not the storage of water, and there can be no pretense that the plaintiff has any right of property in the body of water it holds back. The whole object of this dam is to raise the level of the stream as a means of diverting a part of it into the canal, leaving the surplus to flow over the dam and down the cañon.    According to the testimony the slack

water extends more than three thousand feet above the
dam, and the so-called pond or reservoir has therefore a
length more than ten times its greatest width at the
dam, and more than twenty times its mean width.
Through it there is at all times flowing all the water of
the river, out of which the plaintiff has a right to di-
vert a limited quantity, leaving the surplus to flow on.
It is, therefore, vastly more like what nature made it—
a part of the river channel—than what counsel call
it—a pond.

There is no analogy between the point involved in
this controversy and the point decided in *Rupley* v.
*Welch*, 23 Cal. 453.   There the plaintiff had constructed
a reservoir for impounding the waters flowing down a
ravine, which he used for irrigating a garden and
orchard.   The defendants were not claiming the right
to take the surplus, but, as miners, claimed the right to
divert " *the water*," that is, all the water from plaintiff's
reservoir to their sluices, and had accordingly done so.
The report of the case is very meager, but its meaning
is perfectly plain to anyone who knows how the opera-
tion of sluice-washing was conducted at that date.   The
defendants were digging and sluicing *above* the reservoir,
and, of course, could not draw water for that purpose
from the reservoir.   What they did was to turn the
water into their sluice above the reservoir and discharge
it below, thereby diverting it from the reservoir.   The
question as to their right to tap the slack water in order
to appropriate the surplus could not possibly have arisen,
and clearly was not decided.   The point, and the only
point, contended for by the defendants was that a prior
appropriation of water for irrigation was of no avail
against a subsequent appropriation for mining.   The
court merely decided that the appropriation for irriga-
tion was good against miners as against others, and
that the defendants could not prevent the water so ap-
propriated from flowing into the reservior prepared for
impounding it.   This is a doctrine which, at the present
day, no one disputes, but in early mining times the para-

mount right of the miner was strenuously insisted upon by the miners, and in the mining sections often exercised with a high hand, as it was by the defendants in *Rupley* v. *Welch*, 23 Cal. 453.

To recapitulate and to conclude upon this branch of the case:

The plaintiff has shown no right to the land above its dam, or to the bed and banks of the stream, except such as it can base upon the act of Congress of July 26, 1866, above cited. By that act it has been expressly granted a right to use the water it has appropriated and a right of way for its ditch. It can take nothing as incidental to what has been expressly granted, except what is reasonably necessary to its enjoyment. Conceding that this includes the site of its dam, and the right to maintain it, and to flow the lands above it, it does not include an exclusive right to the watercourse above the dam and below the head of slack water, because such right is not only unnecessary to the enjoyment of that which is expressly granted, but it infringes the equal rights of others. If the land above the dam is public land the same act of Congress grants to defendants a right of way over it to the stream, and to all parts of the stream, for the purpose of diverting the surplus. If the land belongs to the defendants, or if they have the grant or license of the private owner, their right of access to the stream is equally undoubted. They are bound only in appropriating the surplus, whether within or above the slack water, to provide proper head-works for their ditch to regulate the influx of the water, so that the plaintiff may, at all times, have the quantity by it first appropriated.

These conclusions necessarily involve a reversal of the judgment, but in remanding the cause it is proper to notice other errors assigned.

The defendants, for some reason not clearly apparent, set up in their answer the contract of March, 1854, granting to the owners of the Boyd's Bar ditch a right to put a box in plaintiff's dam, etc. They did not allege

any infraction or threatened infraction of their rights under that contract, and asked for no affirmative relief. It is not easy to see what bearing the facts connected with that contract have upon the case made by the complaint or the question which it presents. But at the trial evidence was taken as to those matters, and the court made findings—not very full or explicit—upon which are based certain provisions of the decree regulating the exercise by the parties of their contract rights. The effect of the decree is to limit the defendants to a box two feet square and eight feet long, set upon a level grade with the top of the box on a level with the surface of the pond, reserving to plaintiff the right to close this box at all times when there is not a full supply of water for plaintiff's present ditch.

Neither the findings nor the evidence support this part of the decree. It clearly appears from the evidence, and partially from the findings, that the present capacity of the ditch is materially greater than it was at the date of the contract.

It is found that the canal was enlarged and its capacity increased "*in places*" in 1862, but it is said the evidence does not enable the court to determine how much. As to the expression "*in places*" we know what is meant when a ditch-owner enlarges his ditch and increases its capacity in places. He does not enlarge it in the large places, but in the small places, and by so doing increases its capacity throughout. The evidence in the record shows without contradiction that plaintiff's ditch was widened to six feet on the bottom wherever it was of less width, as it was in many places. The only conflict is as to whether it was prior to the enlargement four feet or five feet wide on the bottom. But whichever it was the enlargement was material, and a finding as to its extent was absolutely essential to a decree settling the right of the parties under the contract.

On the hypothesis most favorable to the plaintiff the capacity of its ditch prior to 1862 is indicated by a section five feet wide at bottom, seven feet wide at top, and

three and one-half feet deep, equal to twenty-one square feet. Its present capacity is measured by a section six feet wide at bottom, eight feet wide at top, and three and one-half feet deep, equal to twenty-four and one-half feet. Its capacity in miner's inches is not found, and the testimony does not show, with any degree of certainty, what it is; but assuming that it is two thousand four hundred and fifty inches, each square foot of the section would represent one hundred inches, and the three and one-half added in 1862 would represent three hundred and fifty inches.

The right to this quantity of water perpetually, or to a half or a quarter of it, is too important to be decreed away without a finding and without evidence to support a finding.

But the superior court seems to have thought it unnecessary to consider the evidence on this point, because in its opinion the acquiescence of the defendants and their predecessors for nearly thirty years in the enlargement of plaintiff's ditch raised an estoppel against them.

But the defendants were not complaining of the enlargement of the canal or of its increased capacity. They never had a right, either under their contract or independent of it, to complain of such enlargement. They could only object to the closing of their ditch or the box that supplied it when there was more than sufficient water to supply the canal according to its capacity at the date of the contract, but not sufficient to supply it as enlarged. And the evidence shows that their box never was closed by plaintiff after the enlargement of its canal. Nor is it found that the plaintiff ever did any other act adverse to the rights of defendants under the contract in such manner or for such time as to gain a prescriptive right.

The decree is also unsupported by any finding as to the dimensions and setting of the box through which the defendants are entitled to draw water from the dam under the contract. The contract does not specify a box eight feet long, or of any length, nor at what level

it shall be set. The evidence of all the witnesses, except one who does not pretend to have measured the box actually used by defendants, or to have had any occasion to observe it with attention, is that it was only three or four feet long, and this is material; for if a box is set level, the longer it is the less water it will deliver.

It is also an objection to the decree that the level at which the box is to be set is not definitely fixed. The level of the water behind the dam is not a practicable gauge, for the evidence shows that this varies greatly according to the stage of the river. If upon a retrial of the cause the rights of the parties under the contract are again submitted for decision and regulation, the court should find the extent to which the plaintiff's canal was enlarged in 1862, and precisely and definitely the dimensions and setting of the box which the defendants and their predecessors put in and used in pursuance of plaintiff's grant.

The judgment and order of the superior court are reversed, and the cause remanded for a new trial.

HARRISON, J., and FITZGERALD, J., concurred.

McFARLAND, J.—I dissent *in toto*, and adhere to the former opinion in Department.

PATERSON, J., concurring.—As I understand this case, and the principles involved, the plaintiff is entitled to water sufficient to fill its ditch to its capacity at the time of the contract with the Boyd's Bar company in 1854, or to such increased capacity as it has acquired the right to fill by prescription or otherwise since that time, and when there is not sufficient water for this purpose may shut down the defendant's gate until there is a sufficient supply.

The defendants are entitled at the proper point to draw from the surplus water—that is, water which would flow over the dam after the plaintiff's ditch is filled.

In determining how, when, and where this surplus may be taken, all the circumstances of the case must be considered. The plaintiff is bound to use reasonable care in diverting sufficient water to fill its ditch so as not to occasion unnecessary waste of the surplus water. To do this it must raise its dam to a height sufficient to fill its ditch whenever the stage of the water renders it necessary to do so. That is to say, plaintiff is not entitled to a flow of eight or any other number of inches of water above and over the crest of the dam, simply to fill its ditch because it has always heretofore enjoyed the same, but, when desiring to obtain a flow of water through its ditch to its full capacity at low stages of the water, it must raise the crest of its dam to a level with the top of its ditch if necessary to fill it, and prevent surplus water, which the defendant desires to use, from flowing over the dam.

Whether the defendants are entitled to tap the stream or pond at any particular point is a question for the court to determine upon all the circumstances. The plaintiff has the right to build and maintain its dam, and to flow back the waters to any extent upon the public domain necessary to fill its ditch in a reasonable manner; and defendants have no right to interfere with plaintiff's works or possessions so as to injure or endanger its dam or other structure, or to render its diversion of water sufficient to fill its ditch more difficult or expensive than it was before, and while operating in a reasonable and careful manner; but, when the purpose of plaintiff's dam has been accomplished, it cannot prevent others from enjoying the use of the waters running to waste, unless they are proposing to take the same at a point or in a manner that will interfere with the free use and enjoyment of its water right or other property. Whatever structures it has found necessary to build are its property, and whether they be dam or sidewalls probably no one would be permitted to cut through or under them under any circumstances; but that is not a question in this case. Here the sidewalls

are natural banks of rock, and the area above the dam
which the plaintiff is entitled to flow and exclusively
occupy is, as stated before, a question for the court to
determine upon all the circumstances of the case.

It does not clearly appear whether the question of
reasonableness of the plaintiff's claim of exclusive con-
trol of all the slack water entered into the judgment of
the court below, but the latter seems to have placed its
decision squarely upon the proposition that the defend-
ants are not entitled to tap the pond of water for the
purpose of drawing water into its ditch at any point
along the line of slack water.

There are other reasons we think why the case ought
to go back for further consideration. The court found
(finding 4) that a temporary crest or "flash board"
eight inches in height is sufficient at low stages of the
water to fill plaintiff's canal to its full capacity, and yet
in finding 5 held that "in order to draw the surplus
from the plaintiff's dam, without taking the water from
plaintiff's canal, it would be necessary to raise plaintiff's
dam from twenty-two to twenty-four inches higher, and
also to raise the banks of plaintiff's canal." There is
here an apparent inconsistency. If the finding quoted
be correct, the plaintiff would be entitled to an injunc-
tion, because, as stated before, the defendants have no
right to impose any additional burden upon the plain-
tiff, except such as is necessary to preserve the surplus
water from waste, or subject its dam or ditch to any ad-
ditional danger.

The evidence shows that the plaintiff's ditch was en-
larged at different points since the date of the Boyd's
Bar ditch contract, but the court does not find whether
these enlargements increased the capacity of the ditch.
It simply finds that "at the point where this widening
of the canal occurred the capacity was increased, but to
what extent the evidence does not enable the court to
determine." The rights given to the defendant by the
contract referred to ought not to be affected by any sub-
sequent alteration of the plaintiff's ditch, and unless the

plaintiffs have acquired the right to use the ditch in an increased capacity through the acquiescence of the defendants, the judgment is erroneous in that regard. In its conclusion of law the court found that, "by reason of the long acquiescence of the defendants, for a period of about twenty-five years, without objection, in such increased capacity of plaintiff's canal as may have resulted from the widening of portions of the canal in 1862 and 1864, the defendants are now estopped from making any complaint of said widening of said canal, and are not entitled to any relief with respect thereto." It is earnestly claimed by appellants that there is "not a scintilla of evidence to sustain the finding or conclusion of law that defendants lost or plaintiff acquired any right by acquiescence or by estoppel of any kind."

This contention is based upon the proposition that the defendant's gate has never been shut down since the plaintiff's ditch was widened; that there has always been sufficient water for both ditches as they now exist; that plaintiff had a right to enlarge its ditch to any size it chose, as long as it did not interfere with the defendant's ditch; that as no right was interfered with, there was no ground for objection, and no suit could have been maintained until defendant's rights were interfered with. The legal propositions involved in this contention are sound, but whether they are supported by the record as claimed we deem it unnecessary to determine, as the case must go back for another trial.

GAROUTTE, J.—I concur in the reversal of the judgment and also in the views of Mr. Justice Paterson upon the principal question discussed.

DE HAVEN, J., dissenting.—I dissent from the judgment. Upon the main question therein discussed I concur in the opinion written by Mr. Justice McFarland in deciding this case in Department, but after a more careful examination of the judgment appealed from I think it erroneous in so far as it reserves to the

plaintiff the right to close the box through which the defendants are to divert the water to which they are entitled under the Boyd's Bar ditch contract, whenever there is not sufficient water to supply the capacity of plaintiff's ditch as at present constructed. It is not clear to me from the evidence that the capacity of this ditch has not been materially increased since the date of the Boyd's Bar ditch contract, but the court below has failed to make any finding whatever in relation to the fact. The cause should be remanded, with directions to the court below to find whether the capacity of plaintiff's ditch has or has not been increased, and thereupon to modify its judgment so as to permit the defendants to exercise all the rights enjoyed by their predecessors under the contract above referred to, the full rights given by that contract, unaffected by any subsequent alteration of plaintiff's ditch.

The following is the opinion rendered in Department Two referred to in the dissenting opinions of Justices McFARLAND and DE HAVEN.

McFARLAND, J.—This action was brought to restrain defendants from diverting water from a stream called the "South Fork of the American river," at and from a certain dam of plaintiff on said stream. Judgment went for plaintiff, and defendants appeal from the judgment and from an order denying a new trial. The main facts in the case are these: In 1851 plaintiff located a dam and canal, the dam to be at a point on said South Fork at a place called "Rocky Bar," and the canal to run to various localities to carry water for mining and agricultural purposes. In 1852 and 1853 the dam and canal were completed. The structure of the dam was at first made of wood, but in 1868 it was rebuilt of stone. The canal was of quite large dimensions, and about eighteen or twenty miles long, and during the later months of the dry seasons carried all the water of the stream. At other times there was a surplus of water, which ran over the crest of the dam. The water

was backed up behind the crest of the dam so as to make a pool or pond. The dam and canal have been in this condition ever since 1853, and have been since then continuously used by plaintiff for beneficial purposes—for carrying water for sale to miners and agriculturists, and for irrigating vineyards and orchards owned by plaintiff. On March 27, 1854, the plaintiff, by a written instrument granted to an association of persons called the Boyd's Bar Water Company, "the right, privilege, and emblement to put in, insert, and maintain in the dam of said Natoma Water and Mining Company . . . . a box of sufficient size, width, and depth to draw water sufficient to fill and supply the ditch, flume, and race of said Boyd's Bar Water Company, at, in, and with its present dimensions, say of two feet square." This instrument also provided that the plaintiff should not be obliged to maintain the said dam; and, further, that if there should occur any deficiency of water to plaintiff's canal, the plaintiff should have the right to close the gate supplying the Boyd's Bar ditch, and keep it closed while the deficiency continued. (In this instrument the word "dam" is evidently used, not in the strict sense of a structure across a watercourse, but in the sense frequently given the word, which includes the pool or pond created by the structure.) Immediately after the execution of this instrument, in 1854, the Boyd's Bar company, under said instrument, "put into" the northerly side of the pool of plaintiff's dam, at a certain place, a certain box, through which the owners of the Boyd's Bar ditch have ever since been accustomed to take water to fill said ditch. And there seems to have been no difficulty about the right to take water under said instrument through said box placed in the side of the dam as aforesaid. Once or twice the plaintiff closed the gate, without objection. In 1883 the defendant, Hancock, became the owner of said Boyd's Bar company's ditch and its rights under said instrument. This ditch is also sometimes called the "Clarke and Eastman ditch." There is

some contention as to that part of the judgment which deals with the Boyd's Bar ditch, and the amount of water to which it is entitled, and that part of the judgment will be hereafter noticed. But the most important contention in the case relates to a new right asserted by defendants, apart from and beyond the right accruing through said Boyd's Bar ditch. In 1887 the defendant, Hancock, posted a notice at plaintiff's dam, to the effect that he intended to widen his ditch so that it would carry two thousand inches of water; that he claimed that much of the water of said South Fork, and that he intended to divert it "from said Natoma dam on the west side of the river." (The canal of plaintiff takes its water from the opposite side of the river, which is sometimes called the "south side" and sometimes the "east side.") Under said notice defendants commenced to enlarge said ditch, and to construct additions to it, and at the commencement of this action a new piece of ditch was being constructed by them near the dam, and had reached within about seventy-five feet of plaintiff's said pond or pool. Shortly afterwards this piece of ditch, which partly consisted of a tunnel through granite rock, had reached to within ten feet of the water of plaintiff's dam, leaving between the ditch and the water only a few feet of earth, which could have been removed by a few hours' work. This ditch, if permitted to be completed, would tap the water restrained by the dam at a point about forty feet above the crest of the dam, and ten inches lower than the bottom of plaintiff's canal on the other side of the stream. The result would be that defendants' ditch would drain the water raised by the dam, so as to take it nearly all from plaintiff's canal. The judgment restrains defendants from thus completing their ditch, and running it into the back water of plaintiff's dam.

Appellants say that they intended only to appropriate the surplus waters of the stream after plaintiff's canal had taken its supply, although their notice does not

state such intention; and they invoke the rule that surplus water may be appropriated. There is no doubt that surplus water may be appropriated; and the quotation·in appellant's brief from section 83 of Pomeroy on Riparian Rights correctly states the rule on the subject. But the author says in that section that such appropriation of surplus water may be made "if no interference with the rights of the prior appropriator is thereby caused." But have appellants the legal right to tap the head of water created by respondent's dam, to inaugurate a perpetual trespass upon respondent's property, to practically take control of that over which respondent has exercised complete dominion and control for nearly forty years, and to take possession of that which respondent has possessed during that period of time? The principles upon which property rights on the public lands of the United States in California were acquired, before government surveys and sales, have long been settled, the main rule being that a prior appropriation gives title. "Legislation and decisions have been uniform in awarding peaceable enjoyment to the first occupant either of the land or of anything incident to the land." (*Tartar* v. *Mining Co.*, 5 Cal. 398.) Such appropriation was effected either by taking actual possession—*possessio pedis*—or, by doing such acts as, considered with reference to the nature of the right to be acquired, were, in good sense and according to established customs, equivalent to actual possession. Water was appropriated by constructing ditches and turning water into them by means, generally, of dams erected across watercourses; rights to the future diversion of the water, pending the completion of the ditches, being preserved by notices of intention to divert. Under this system properties of immense values were created in ditches, canals, and dams; and Congress, by the act of July 26, 1866, enacted that such properties should be maintained and protected. This act was held by the United States supreme court in *Broder* v. *Water Co.* (respondent in the case at bar), 101 U. S. 274, to be a

mere "recognition of the pre-existing right of posses-
sion"; and it is clear that respondent's pre-existing
right of possession embraced its dam and the head and
elevation of water created by it, and the pond and·pool
behind it, and the land perpetually covered and occu-
pied by the water as fully and effectually as it did any
other part of its canal property. The dam, including
the land which is necessarily covered with water in or-
der to be of any beneficial use, the water-head, and the
pool or pond with its lateral approaches and supports,
was an integral part of the canal itself. Indeed, as
stated in *Hutchinson* v. *Railroad Co.*, 37 Wis. 604, al-
though the strict meaning of the word "dam" is a bar-
rier built across a watercourse to confine and keep back
flowing water, yet it is frequently used to designate all
that results from the barrier. It was said in that case:
"So we sometimes hear of fishing or bathing in a dam;
and often of water in a dam—meaning in the pond.
So a pond is made to include the dam, even in judi-
cial phrase. (*Jackson* v. *Virmelyea*, 6 Cow. 677.) And
the grant of a dam is held to include an easement in
the pond. (*Maddox* v. *Goddard*, 15 Me. 218.)" But by
whatever name it may be called, respondent obtained a
possessory right and title to the land which it appro-
priated and permanently occupied by means of its dam,
and acquired the right to maintain the pond or pool and
head of water above the barrier which it built across
the stream; and this title was as perfect as any other
title to a part of the public domain acquired by appro-
priation for any other legitimate purposes. It was ex-
pressly held in *Rupley* v. *Welch*, 23 Cal. 453, "the
construction of a reservoir across the bed of a ravine
for the purpose of collecting the water flowing down the
same, to be used in irrigating a garden or fruit trees,
gives to the party constructing the same a vested right
of property in the reservoir." (Of course, in all such
appropriations—even of mining claims—there had to
be a reasonableness as to the amount or extent of the
appropriation; but no such question arises in the case

at bar.)   According to the foregoing views the court
below was right in enjoining appellants from running
their ditch into respondent's pool, and into and upon
the land possessed by respondent, by means of its dam
and pool.   An injunction always lies to restrain threat-
ened permanent interference with water rights.   (Angell
on Water Courses, sec. 444, et seq.; California cases cited
in Gear's Index Digest, at foot of page 426.)   "The in-
terposition of a court of equity was required to prevent
defendant's wrongful acts from ripening into a right,
and on that ground alone the interference of a court of
equity was properly asked and granted." (*Moore* v. *Clear
Lake Water Works Co.*, 68 Cal. 146; *Mott* v. *Ewing*, 90
Cal. 231.)   Moreover, whenever there is a threat and
intent to wrongfully enter upon another's real property,
and to take permanent possession thereof and effect a
permanent lodgment there, the threatened injury is
"irreparable in itself," and the insolvency of the in-
truder or the actual damage which may ensue is im-
material. (*More* v. *Massini*, 32 Cal. 595; *Richards* v.
*Dower*, 64 Cal. 62; *Crescent City Wharf and Lighter Co.*
v. *Simpson*, 77 Cal. 290.)   Again, the threatened acts of
appellants would be in the nature of waste, would destroy
the very substance of respondent's estate, and would
create a perpetual nuisance; and against such acts in-
junction is the proper remedy.   Such acts would not
constitute mere fugitive and temporary trespasses, but
a trespass of a continuing nature, whose constant re-
currence would render a remedy at law entirely inade-
quate.

With respect to respondent's rights under the Boyd's
Bar contract, we think that they are sufficiently pre-
served by the judgment.   The judgment decrees that
"defendants may take sufficient water from plaintiff's
said dam to supply a ditch two feet wide and two feet
deep with the grade of the ditch known in 1854 as the
'Boyd's Bar ditch'"; and we do not think that the
specification of the box (and its location) through
which the water is to be taken is any abridgment of

the right.   The water is to be taken substantially in the manner in which it has always been taken since 1854.   It is contended that respondent's canal has been enlarged since the date of the contract, and that therefore respondent should not now have the right to close the Boyd's Bar ditch when the canal is not supplied. But the court does not find that the carrying capacity of the canal has been increased.   In 1862 and 1864 the respondent cleaned out the canal, and reconstructed some portions of it by substituting earthwork for wooden flumes; and the court merely finds that in "some places" it was made wider, and that at those places the capacity was increased, but to what extent the evidence does not show.   The evidence does not show an increase of the capacity of the whole ditch, and it is not likely that if there had been any substantial increase, the owners of the Boyd's Bar ditch would have acquiesced therein for nearly thirty years.   Indeed there is not and has never been any serious trouble between the parties growing out of the Boyd's Bar contract; the real contest is about the new right asserted by appellants.   The doctrine that the point of diversion of water may be changed is, of course, subject to the condition that the change must not interfere with the rights of other parties.   With respect to the minor points in the case, it is sufficient to say that, in our opinion, the findings are sustained by the evidence, and that the findings are full enough to determine the material rights of the parties.   We see no error in the record. Judgment and order affirmed.