[Civil No. 2396.  Filed April 19, 1926.]

[245 Pac. 369.]

# PIMA FARMS COMPANY, a Corporation, Appellant, v. HENRY PROCTOR, Appellee.

1. WATERS AND WATERCOURSES.—It is public policy of state to make largest possible use of water within its boundaries.

2. WATERS AND WATERCOURSES—WATERS OF UNDERGROUND STREAM ARE AS AVAILABLE TO APPROPRIATION AS WATERS OF SURFACE STREAM AND GOVERNED BY SAME PRINCIPLES OF LAW.—Under doctrine of prior appropriation, waters of an underground flowing stream are as available to appropriation as waters of surface stream and governed by same principles of law.

3. WATERS AND WATERCOURSES—MEANS OF APPROPRIATION ARE OF SECONDARY CONSIDERATION IN DETERMINING RIGHTS OF APPROPRIATORS, BUT ARE NOT INCONSEQUENTIAL.—In determining rights of appropriators, means of appropriation are of secondary consideration and may be changed by the appropriator from time to time if no injury results to others, but means are not inconsequential, for without them the water right would be unavailable and worthless.

4. WATERS AND WATERCOURSES—APPROPRIATOR IS ENTITLED TO HAVE WATER FLOW DOWN "NATURAL CHANNEL" TO POINT OF DIVERSION UNDIMINISHED, OR, IF DIVERTED BY OTHER APPROPRIATORS, TO HAVE IT DELIVERED TO HIM AT THEIR EXPENSE.—An appropriator of water from a running stream is entitled to have it flow down the "natural channel" to his point of diversion undiminished in quantity or quality, or, if diverted from natural channel by other appropriators for their convenience, to have it delivered to him at available points by other means provided by subsequent appropriators at their expense; "natural channel" being floor or bed on which water flows and banks on each side thereof as carved out by natural causes.

5. WATERS AND WATERCOURSES—NO PERSON WILL BE PERMITTED TO DECREASE QUANTITY OF UNDERFLOW TO DEPLETION OF SURFACE STREAM, THEREBY RENDERING INEFFECTIVE PRIOR APPROPRIATOR'S MEANS OF DIVERSION.—While prior appropriator does not acquire any vested right to entire volume of stream as aid to his means of appropriation, he gets an easement in the bed of the stream

---

2.   See 27 R. C. L. 1262.
3.   See 27 R. C. L. 1279.

and the underflow to support and carry his water so that it may be used and enjoyed, and no person will be permitted to decrease the quantity of the underflow to the depletion of the surface stream and thereby destroy or render ineffective the prior appropriator's means of diversion.

6. WATERS AND WATERCOURSES—APPROPRIATOR OF UNDERFLOW OF STREAM MUST ADOPT MEANS TO PRESERVE PRIOR APPROPRIATOR'S RIGHTS.—While the underflow of a running stream may be appropriated, those appropriating it must adopt means to preserve to the prior appropriator his rights without injury to him.

7. WATERS AND WATERCOURSES—SENIOR APPROPRIATOR IN UNDERGROUND STREAM IS ENTITLED TO HAVE LEVEL RETAINED SO HIS ORIGINAL PUMPS AND WELLS WILL NOT BE RENDERED INEFFECTIVE. Senior appropriator by means of wells and pumps from independent underground stream is entitled, as against subsequent appropriator, to have such stream level remain so that his means of capture and diversion as originally installed will not be impaired or destroyed for his uses, or in lieu thereof to have later appropriator deliver him his water in such a manner as to make it available for his use.

8. WATERS AND WATERCOURSES—SUBSEQUENT APPROPRIATOR HELD REQUIRED TO DELIVER TO PRIOR APPROPRIATOR HIS APPROPRIATION ON RENDERING PRIOR MEANS OF DIVERSION INEFFECTIVE.—Subsequent appropriator, a private service corporation delivering water, *held* properly required to deliver from its canals to prior appropriator his appropriation, where it had rendered means of diversion of prior appropriator worthless and ineffective; such arrangement effectively carrying out policy of state in allowing unappropriated waters of underground stream to be appropriated and still to protect rights of prior appropriator.

See (1, 2) 40 Cyc., p. 703, n. 95 New, p. 704, n. 7.   (3) 40 Cyc., p. 720, n. 19.   (4) 40 Cyc., p. 713, n. 74, p. 714, n. 77, 78 New. (5, 6) 40 Cyc., p. 704, n. 11 New, p. 713, n. 74, p. 724, n. 39.   (7) 40 Cyc., p. 724, n. 39.   (8) 40 Cyc., p. 724, n. 39.

APPEAL from a judgment of the Superior Court of the County of Pima.   George R. Darnell, Judge. Affirmed.

Messrs. Kingan, Campbell & Conner, for Appellant.

Mr. Edwin F. Jones, Mr. George O. Hilzinger, Messrs. Curley & Pattee and Mr. Milton M. Cohan, for Appellee.

30 Ariz.—7

ROSS, J.—This is an appeal by defendant, but we will refer to the parties as they were designated below.

It appears from the record that plaintiff and defendant are appropriators of water for beneficial uses from an underground stream of flowing water located in Santa Cruz Valley, Pima county, Arizona. It is assumed or conceded throughout that this body of water is a known independent subterranean stream; that is, that it is independent of the influence of any surface stream and flows within well-defined and known channels, the course of which can be distinctly traced. 2 Kinney on Irrigation and Water Rights, 2d ed., § 1156. Both parties employ the same kind of means to get the water from this underground stream on to their lands; that is, by sinking wells through the overlying crust into the body of water and raising the water therefrom by means of pumps, through which it is discharged into canals and ditches and conveyed on to the land for application.

The plaintiff is the owner of 320 acres of arid land situated, or partly situated, over this body of water. In 1913 he sunk on his premises two wells, in one of which the water-level was 55 feet and the other 39 feet, and in 1916 he sunk a third well in which the water-level was 45 feet below the earth's surface. Why the water-level differs in these wells is not shown. The latter was some 200 feet deep, the second one 170 feet, and the depth of the first one is not given. In June, 1923, the time of the filing of suit, the plaintiff had appropriated waters of said underground stream to irrigate 180 acres of his 320 acres, and to furnish his needs for domestic and other beneficial purposes, the quantity required and actually used for agricultural purposes being about three acre-feet annually per acre.

In 1919, one Edwin R. Post came into control and possession of 6,000 acres of land upstream from but contiguous to plaintiff's lands, and in the latter part of that year and the early part of 1920 sunk several wells upon said premises into said stream and equipped them with pumps of large capacity, and by means thereof began to divert the waters thereof for domestic and agricultural and other beneficial uses. In 1921 the defendant Pima Farms Company, at a receiver's sale, purchased the Post interests in said enterprise, and thereafter sunk on said premises other wells, so that at the time of trial the defendant had about twenty-six wells from which it was pumping the waters of said stream for the purposes aforesaid. It admitted in its answer that approximately 8,000 acres were at that time being irrigated from its wells, some, if not most, of which lands were five or six miles downstream from defendant's and plaintiff's lands and wells, and stated that it intended to divert and appropriate from said stream, by means of its wells and pumps, enough of the unappropriated waters to reclaim and irrigate 14,000 acres in all. Some of the lands being irrigated belonged to defendant, but the larger acreage thereof had been sold or contracted by it to farmers, whom it served with water from its wells.

The taking of the water out of said stream above plaintiff's wells by defendant resulted in lowering the water-level in plaintiff's wells, so that the latter's pumping equipment was inadequate to furnish him his quantity of water. Plaintiff adjusted his equipment once to meet the changed conditions because of the lowering of water-level by defendant, but as the reduction was a continuous one, if he would obtain water he must continue to change his pumping equipment. At the time of bringing suit, the water-level had been lowered about 22 feet, so that in plaintiff's

third well it stood at 67 feet instead of 45 feet—the level before defendant and its predecessor began pumping—and the other two wells were affected in like manner. At the time of filing suit and at the time of trial, there was ample water at the lower levels for plaintiff's needs, which could be obtained by him by the installation of additional adequate equipment at substantial increased cost.

There are no disputed questions of fact, and we think we have stated all that are necessary to a determination of the controversy. If others occur to us, they will be stated in the course of the opinion. The plaintiff's cause of action therefore is predicated on the proposition that the senior appropriator of water, by means of wells and pumps, from an independent underground stream of flowing water, is entitled, as against subsequent appropriators, to have such stream's level remain so that his means of capture and diversion as originally installed will not be impaired or destroyed for his uses, or, in lieu thereof, to have the later appropriators deliver to him his water in such manner as to make it available for his uses. The soundness of this proposition is contested by the defendant, who admits that plaintiff is the prior appropriator and entitled as such to take out of the body of the stream his quantity of water as against defendant, but contends that its act in appropriating the rest of the water was lawful and in strict accord with the doctrine of appropriation, and that plaintiff's complaint is without legal or any foundation.

The judgment favored plaintiff by enjoining defendant from drawing off the waters of the stream so as to disable plaintiff from obtaining his water with the equipment he had installed, but suspended such judgment pending defendant's accepting and adopting a method or plan, therein stated by the

court, of furnishing water through one of its canals to plaintiff, the latter to pay therefor on terms fixed or to be fixed by the court. The court retained jurisdiction to supervise the use of water and to revise such judgment from time to time as necessity might require. We do not set forth the full terms of the judgment, for the reason that we do not understand the defendant complains of its terms if the court had power to enter it.

At the beginning we wish to express our appreciation of the commendable frankness of counsel on both sides in presenting the propositions of law they rely upon, and for the clear statements thereof, and also for the thoroughness of discussion and briefing. Their industry and learning have wonderfully illuminated the subject and facilitated our work, and we take pleasure in acknowledging the assistance they have given us in trying to evaluate and solve a question new to our jurisdiction and unanswered directly by the courts of any other state. It will appear at once that the question is one of great importance, since it involves one of the most precious of our natural resources—precious because of its scarcity and the great need of it as an aid to reclaim our acres of wonderfully productive soil that responds so readily to its quickening power. It is important, also, because it requires the formulation of a rule that will permit successive appropriations of an independent underground stream of flowing water to the point of exhaustion, and at the same time give reasonable protection to the rights of the senior appropriator with as little expense and hardship upon the subsequent appropriators as possible. This has not been done by any court of last resort, so far as we know, and we cannot, therefore, fall back on precedents, but must be guided by the general principles and rules the courts have followed in settling disputes over the

waters of surface streams and lakes of public water where the doctrine of prior appropriation prevails.

The source of supply of plaintiff and defendant, as indicated by explorations at the date of trial, is quite a large body of water, and none of it should be permitted to go to waste if it can be lifted out of the bowels of the earth and economically applied to a beneficial use. It is, and has ever been, the policy of this state to make the largest possible use of the comparatively limited quantity of water within its boundaries. In order to do that, it is obvious that some other rule than the riparian doctrine should be the standard adopted. Accordingly, the territory at an early date, and the state upon its organization, abrogated the common-law rule of riparian rights as unsuitable to our conditions, and, in accord with most of the western arid states, adopted the doctrine of prior appropriation. Under this doctrine, the waters of an underground flowing stream are equally as available to appropriation by the owners or possessors of arable or irrigable lands as the waters of a surface stream, and the appropriation is governed by the same principles of law. 2 Kinney on Irrigation and Water Rights, 2d ed., § 1158. The same learned author, in the following section, also states:

"And if it has been once appropriated and actually applied to some beneficial use or purpose, it cannot be interfered with either by subsequent appropriators or by the landowners through which these streams naturally flow. No distinction in this respect exists between waters running under the surface in well-defined and known channels and those running in distinct channels upon the surface."

In *McCall* v. *Porter*, 42 Or. 49, 57, 70 Pac. 820, 823, it is said:

"The foundation of the doctrine of prior appropriation of water is, prior in time, prior in right, and therefore he whose appropriation is first in time

acquires rights against subsequent appropriators, locators, or grantees, to the extent of his appropriation. The waters of a natural stream are subject to successive appropriations, and, so long as the subsequent appropriators do not injure or impair the rights of those prior to them, they may use as much water as they choose. There may thus be numerous and different appropriators of the waters of the same stream; the rights of each depending, as against the others, on the date or time of his appropriation.''

But defendant says the right in water the law will protect, as against subsequent appropriations, is the right to have the amount of water the prior appropriator has successfully applied to the beneficial use designed to flow in the natural channel to his diversion ditch (in this case diversion well and pumps), but no more, and that so long as defendant permits to flow to plaintiff's wells a quantity of water equal to the latter's appropriation and he can capture and divert it, no difference how deep he may have to go or how great the expense, no right of plaintiff's of which he can complain has been violated. In other words, the ''right'' subsequent appropriators must respect and not injure or impair is the right to a use of so much water as he may have appropriated and beneficially applied, and has no reference whatever to the means employed by him to divert such water.

If the first appropriator's rights are superior under the law, they should be made so in fact. The practical effect of allowing defendant's contention would place the burden on the senior appropriator of adjusting and changing his diversion means to conform to the necessities and convenience of the junior appropriator, and make his rights subservient to the rights of the latter. The rule, uniformly applied by the courts in controversies between senior and junior appropriators over rights not only to water but the means of diversion, emphatically rejects as unjust

and inequitable such a proposition. ''First in time, first in right,'' must be given a practical construction with the view of protecting the one pioneering the field. This, whether his act be simply the digging of a shallow ditch into the sides of a surface stream whereby he conveys its waters on to the land for agricultural and beneficial uses, or whether it consist of expensive wells sunk far into the earth, from which the water is pumped on to the soil. While the former method was the typical one used by first settlers of the arid west, and must frequently have been before the courts for protection and adjustment when others subsequently sought to divert waters from the same stream at or near the same place, or above or below, the dearth of reported cases exactly in point may be accounted for by the first and later appropriators adopting the community ditch or acequia idea inherited from the early Mexican and Indian inhabitants of this country, and which is now and has ever been a helpful guide to the courts in controversies over surface water rights. The reason for protecting the first appropriator's means of diversion when he takes his water from a surface stream whose location, volume, depth and width is in open view and capable of measurement and easily obtained by gravity ditches, it seems to us, is emphasized when the stream is hidden from view and incapable of location or measurement, and where the ditch is a vertical artificial container from which the water is forced or lifted by pumps. In the latter case the diversion means are not only expensive, but if the appropriator's well should happen to be on the sides instead of the bed or main current of the hidden stream, the water-level could be lowered to the bottom of his well leaving it high and dry; and, according to defendant, plaintiff would be without any remedy except the remedy of sinking other wells to the lowest bed of

the stream, if, perchance, he could find it, and there install adequate equipment to raise the water to the surface. Such an inequitable burden on the first appropriator should be avoided, if possible.

It is true the means of appropriation are a secondary consideration, and may be changed by the appropriator from time to time if no injury results to others, or may be changed by direction of the courts in proper cases to enlarge the use of the waters of the stream; but the means are not inconsequential because without them the water right would be unavailable and worthless. In discussing this question, Mr. Kinney (volume 2, section 801 [second edition]) says:

"Although, as we have seen in previous sections, the appropriator has no property in the *corpus* or very body of the water while it is still flowing in the natural stream above the head of his ditch or canal, yet, by virtue of his prior appropriation, he acquires a most important legal and equitable property right in and to such water and the right to have the same flow down, either to his point of diversion, as it flowed at the time of the inception of his appropriation, or, at least, in lieu thereof, to have the full amount of water and of the same quality to which he is entitled, delivered to him by some artificial means at a point above his place of use. In regard to the latter method, owing to the multiplication of uses to which the same water can be put without interfering with the rights of others, and in order that the greatest good shall accrue to the greatest number, we can see no legal objection, so long as the rights of the prior appropriator are in no way infringed upon to his material injury, and he receives the full amount of water that his appropriation calls for and at a point where he can use it to the same advantage as though it was left flowing in the natural stream to the intake of his ditch. In the matter of the right to have the water flow in the natural stream to his point of diversion, and in cases where the question of artificial delivery was not involved, it has been repeatedly held

that the right of the prior appropriator to have the water continue to flow in its usual manner through its natural channel to the full extent of his appropriation down to the head of his ditch, without diversion or interruption by others claiming subsequent to him, is an incorporeal hereditament appurtenant to the ditch and coextensive with the appropriator's right to the ditch itself. . . . But the prior appropriator of the waters of a certain stream has the right to insist that the water continue to flow as it did when he first made the appropriation, as far as the interference by other subsequent appropriators is concerned. 'The appropriator took the water with the right to have the stream flow as it was wont to flow' is the language of the law under the Arid Region Doctrine of appropriation, which is as strict a rule as that of the common law of riparian rights, *aqua currit et debet currere ut currere solebat.* He has also the right to insist on this flow and that no change be made in it by later comers to his material injury.''

It has been held that a subsequent appropriator may not interrupt the flow of water and ''prevent or diminish the saturation of the sandy bed underlying the stream and thereby materially postpone the time when a surface flow would come to plaintiffs' lands. Such postponement,'' says the court, ''would be a clear injury to the plaintiffs, whose interest in the waters of the stream included the right to have the river bed continue to hold sufficient water to supply and support the surface stream in its natural state.'' *Huffner* v. *Sawday,* 153 Cal. 86, 93, 94 Pac. 424, 427.

An appropriator of water from a running stream is entitled to have it flow down the natural channel to his point of diversion undiminished in quantity and quality or, if diverted from the natural channel by other appropriators for their convenience, to have it delivered to him at available points by other means provided by subsequent appropriators and at their expense. This seems to be a rule of general accommodation and utility and has been universally fol-

lowed by the courts when applied to surface streams. When we speak of the "natural channel," we mean the floor or bed on which the water flows and the banks on each side thereof as carved out by natural causes. The prior appropriator in such cases is entitled to his quantity of water upon the surface at his point of diversion. The subsequent appropriators cannot say to him, "We have left an underflow sufficient in quantity for your needs which you may obtain by lowering your ditch so as to tap the underflow, or by building a submerged dam and raising the water to the surface you can secure your quantity of water." Thus, while the senior appropriator does not acquire any vested right to the entire volume as an aid to his means of appropriation, he may insist that it be left to reach him in quantity and quality in the natural channel of the stream or by artificial means equally as effective. Where the stream is entirely hidden from view, and its existence, depth, width and volume can only be determined by exploration, and where the water therefrom can only be had by means of pumping, to limit the senior appropriator's rights to have his water pass his point of diversion somewhere within the limits of the underground flow or natural channel, and compel him to adjust his means of diversion as often as the plane of the water-level is changed, presents a somewhat analogous situation, susceptible of a like solution. His problem should be treated like that of the prior appropriator of the surface water of a stream having a subsurface.

No person will be permitted to decrease the quantity of the underflow to the depletion of the surface stream, and thereby destroy or render ineffective the prior appropriator's means of diversion. Section 1163, 2d ed., 2 Kinney on Irrigation and Water Rights. In other words, the appropriator does get

something more than a water right; he gets an easement in the bed of the stream and the underflow to support and carry his water so that it may be used and enjoyed, and while he does not appropriate or apply to a beneficial use, as that term is understood, the underflow, and while such underflow may be appropriated, those who appropriate it must adopt means to preserve to the prior appropriator his rights without injury to him.

Now when the body of water, as here, is overlaid with a 45-foot cover of sand, gravel and earth, and cannot be reached and diverted by the common and usual methods of gravity but only by sinking deep wells in which such water is collected and from which it is pumped out upon the earth's surface for use, to permit a junior appropriator, who, perhaps, obtains his knowledge of such body of water by the pioneering explorations and sacrifices of the first appropriator, to lower the water-level and thereby destroy or greatly impair the latter's means of diversion, including his pumps and water containers, does not comport with justice and equity, nor is it in conformity with the spirit of the rules adopted by the courts for the adjustment of disputes over water and its use in the arid regions of the west. We think in such a case the first appropriator should be protected, and is entitled to protection upon the same principle that affords protection to an appropriator of surface water in a running stream against depletion of the undercurrent to the extent of preventing the free flow of his appropriation in quantity and quality to the head of his ditch.

In *Salt Lake City* v. *Gardner*, 39 Utah 30, 114 Pac. 147, the situation was the same as we have here, except the appropriations were from Utah Lake, a surface body of water open and visible and capable of measurement. The prior appropriators had, at con-

siderable expense, installed pumps, and for some years had used them to supplement their water supply by pumping from the lake when the gravity flow therefrom was inadequate for their uses. In that case it was held that water left in the lake after the first appropriators had been supplied their appropriation was subject to appropriation, even though it necessitated a change in the method or means used by the first appropriators to withdraw the waters they were entitled to, but that the expense of such change must be borne by the subsequent appropriators. In the Salt Lake case the contention of the subsequent appropriators was the same as defendant's in this case, and that court made reply to it as follows:

"Counsel for respondents, however, insist that the prior appropriator acquires no right in his means of diversion, but obtains a prior right only to use the quantity of water appropriated and applied to a beneficial use by him. We cannot yield assent to this view. We think the original taker or appropriator from a stream or body of water also acquires the right to continue to use his method or means of diverting which he has installed. If this be not so, then prior appropriators, who have appropriated only in small quantities, and whose means of diversion from the stream are simple but sufficient for their purpose, could have their means made entirely ineffective by a subsequent appropriator of a large volume of water the diverting of which would so lower the stream that the water would no longer reach the point of diversion of the small appropriator. In this way it may well be that the cost to the small appropriator to make the water appropriated by him available for his purpose might under changed conditions be prohibitive if not ruinous. Upon the other hand, the cost of making the change might not be so great as to prevent the larger appropriator from supplying and paying for some means whereby the prior rights to the use of the water appropriated by the small user might be preserved, and the wants of the large

appropriator could nevertheless be met and supplied. In this way, perhaps, very large quantities of water theretofore wasted, or used only to aid the original appropriator to obtain his meager supply, would be put to a useful and beneficial purpose without destroying the rights of anyone. If it be held, therefore, that a subsequent appropriator of water need have no regard for the diverting means or methods of the prior appropriator, but may in fact or effect make prior appropriations of water unavailable with impunity, then there is in fact no such a right as a prior right, but all rights may, at any time, be invaded or destroyed by a subsequent appropriator by simply making the diverting means used by the prior appropriator useless. To permit such an invasion of a prior right would, in effect, amount to an indirect taking of a prior appropriator's water. This neither the legislative nor the judicial power can allow without permitting confiscation of property rights.''

This case not only recognizes that the means of diverting the waters from the body of the lake was a valuable property right and, as such, entitled to protection, but adopted a plan or method by which the subsequent appropriators might utilize for beneficial uses all the water contained in the lake. This is in line with the public policy of this state that the broadest possible use of the public waters shall be had.

The defendant in this case, as disclosed by its answer, is engaged in the business of delivering water to a large number of farmers, and is therefore a public carrier, and to require it for proper compensation, under reasonable regulations, to serve the plaintiff would not be a departure from its business of carrying water but in line therewith. This will preserve the plaintiff's rights; whereas, if defendant's contention should be sustained, the result would be disastrous to the plaintiff, causing an entire loss of his water rights or entailing repeated and continuous and expensive changes in his means of diversion.

While the defendant admits that the Salt Lake case, *supra,* may possibly declare the law contrary to its contention, it cites and relies upon *Schodde v. Twin Falls Land & Water Co.,* 161 Fed. 43, 88 C. C. A. 207; 224 U. S. 107, 56 L. Ed. 686, 32 Sup. Ct. Rep. 470, as taking a contrary view and one in harmony with its position. The facts in the Schodde case are not parallel to the facts here. The plaintiff there was a prior appropriator of water from Snake River to irrigate some four hundred acres of land and for mining purposes, and he had adopted as his means of diversion a system of water-wheels so placed in the bed of the river that the force of the water striking against them caused them to turn and lift the water into flumes, from which it was conveyed to his lands and mines for use. The defendant corporation built a dam across the river below plaintiff's point of diversion for the purpose of impounding the waters thereof for use in reclaiming about 300,000 acres of land in the vicinity, in the ownership of and for the benefit of some five thousand people. The dam collected the water and caused it to back upstream and neutralize the current so that it no longer turned the water-wheels, and in that manner rendered plaintiff's means of diversion ineffective and useless. His prior right to the quantity of water he had appropriated was recognized by the court, but his claim, that because he had employed the energy of the current as his motive power to lift the water for distribution on to his land before the dam was built gave him the right as against subsequent appropriators to continue such use as an appurtenant to his water right, was denied. The plaintiff's grievance, it is seen, was not that his water was being taken from him or the level thereof reduced so that he could not reach it with his means of diversion, but that he had been deprived of the water energy as a motive power. As a matter of fact the

dam had increased the quantity of water at his point of diversion.

The circuit court of appeals, by process of reasoning entirely satisfactory to the Supreme Court, and it seems to us unobjectionable, concluded that plaintiff did not appropriate with his water right the energy of the current but, on the contrary, while his acts gave him a water right in Snake River, he should be required to exercise it with reference to "the necessities of the people, and not so as to deprive a whole neighborhood or community of its use and vest an absolute monopoly in a single individual."

In the Salt Lake case the plaintiffs were not using the energy of the water as their motive power, nor is the plaintiff in this case. The power the plaintiff uses and the other means employed by him to get his water are entirely artificial. In the Schodde case the plaintiff was not asking for protection of his means of diversion, and if he had been the facts and circumstances were such that it would have been impossible to allow him to use the energy of the stream for his motive power without giving him a complete monopoly of the water. The situation here is very different. It is possible and right to afford the protection the plaintiff asks so that his water right may not be destroyed because of the difficulties and hardships that would be cast upon him if defendant were permitted with impunity to withdraw the water from above him, rendering his means of diversion worthless and ineffective. His right may be protected and at the same time the defendant be permitted to appropriate for beneficial use the unappropriated waters of the underground stream by requiring the latter to provide plaintiff from its water system the amount of his appropriation. This arrangement will effectually carry out the policy of the state of not permitting

anyone to so exercise his water right as to restrict or limit the use of the public waters of the state. Since it appears the defendant is a public service corporation, already actually engaged in the delivery of water to the larger part of the 8,000 acres of land now under cultivation, it seems improbable that to require it to deliver water to the plaintiff, upon the same or equal terms that it is delivering water to its other customers, will work any severe hardship.

The judgment of the lower court is affirmed.

McALISTER, C. J., and LOCKWOOD, J., concur.