(No. 5856.   November 2, 1933.)

WILLIAM NOH and AMELIA NOH, Husband and Wife, Respondents, v. J. H. STONER and ETHEL STONER, Husband and Wife, JULIA STONER, CHRIS AR-STEIN and FRED MILAR, Appellants.

[26 Pac. (2d) 1112.]

James R. Bothwell, for Appellants.

S. T. Hamilton, Frank L. Stephan, and J. H. Blandford, for Respondents.

GIVENS, J.—Respondents sued for and were granted an injunction, restraining appellants, adjoining land owners, from further depleting an artesian basin tapped by respondents' two wells, drilled and operated prior to appellants' well. Both parties rely upon the proposition that

subterranean waters of the nature herein are subject to appropriation and diversion as surface waters and are governed by the same rule of priority. (*LeQuime v. Chambers,* 15 Ida. 405, 98 Pac. 415, 21 L. R. A., N. S., 76; *Bower v. Moorman,* 27 Ida. 162, 147 Pac. 496, Ann. Cas. 1917C, 99; *Hinton v. Little,* 50 Ida. 371, 296 Pac. 582; *Silkey v. Tiegs,* 51 Ida. 344, 5 Pac. (2d) 1049.)

Appellants argue that the opening of appellants' well did not cause all the depletion of the respondents' water supply, but that the loss in respondents' wells was somewhat occasioned by leaks in respondents' wells.

A careful study, however, of the record discloses that the evidence is sufficient to sustain the findings that because appellants operated at a level below respondents' pumps, not because of leaks in respondents' well, the water level in the artesian basin was lowered to such an extent that respondents' pumps were dry.

In other words, appellants had pushed their point of diversion lower than respondents' point of diversion and as a result there was no water at respondents' point of diversion.

The appellants urge:

"The necessity of a prior appropriation changing the methods or means of diverting water from the source of supply, by installing and employing, reasonable and average, but more powerful pumps and increased pumping depth, will not deprive a subsequent appropriator of the right to divert and use unappropriated subterranean water, and the prior appropriator must take the usual and reasonable measures to perfect such means."

This statement of the controversy is not quite correct; it is not altogether a question of unappropriated subterranean waters, since appellants rely on the doctrine to the effect, that with subterranean or artesian waters, first in time is first in right (*Bower v. Moorman, supra; Hinton v. Little, supra*); announcement of this doctrine culminating in *Silkey v. Tiegs, supra.*

Appellants contend that respondents' appliances are not sufficient and that the duty rests on them to put in adequate pumps, meaning thereby that they should put their pumps at a lower point and perhaps also increase their capacity, relying on *Natoma Water & Min. Co. v. Hancock*, 101 Cal. 42, 35 Pac. 334, which, however, rests upon *Barrows v. Fox*, 98 Cal. 63, 32 Pac. 811, and approves the doctrine therein to this effect: an earlier appropriator is not required to bear the expense incident or necessary to secure a flow of water to a later appropriator.

Appellant cites 26 Cal. Jur., sec. 311, p. 112:

"A court of equity may, under proper circumstances, compel a prior appropriator to change the manner of his use so as to prevent unnecessary injury to those having subordinate rights, . . . . " The text, however, has this in addition: "Of course, any interference with the rights of prior appropriators is actionable. Whether a subsequent use causes such interference is a question of fact."

Herein the court has found on substantial though conflicting evidence that appellants' use interferes with respondents'.

*Walnut Irr. Dist. v. Burke*, 158 Cal. 168, 110 Pac. 518, allows a change or point of diversion only where there is no injury to the prior appropriator.

No cases are cited which are *contra* to *Barrows v. Fox*, *supra*, and other subsequent authority sustains the doctrine of that case: *Big Cottonwood Tanner Ditch Co. v. Shurtliff*, 49 Utah, 569, 164 Pac. 856; *Joseph Milling Co. v. City of Joseph*, 74 Or. 294, 144 Pac. 467; *Southside Improvement Co. v. Burson*, 147 Cal. 401, 81 Pac. 1107; *Witherill v. Brehm*, 207 Cal. 574, 279 Pac. 432, 435; *Joerger v. Pacific Gas & Electric Co.*, 207 Cal. 8, 276 Pac. 1017, 1024; *Midway Irr. Co. v. Snake Creek Mining & Tunnel Co.*, 271 Fed. 157; *Snake Creek Mining & Tunnel Co. v. Midway Irr. Co.*, 260 U. S. 596, 43 Sup. Ct. 215, 67 L. ed. 423.

*Erickson v. Crookston Waterworks Power & Light Co.*, 105 Minn. 182, 117 N. W. 435, 17 L. R. A., N. S., 650, relied on by appellants as sustaining their position, is based

on the doctrine of "correlative use," which does not obtain in Idaho, and which case was sent back for further consideration, as was the case in *Bower v. Moorman, supra,* which case is in point, since therein the main point of reversal was:

"The evidence offered by the respondents in this case to establish the loss of water in their wells by reason of the construction of the appellants' well is not as clear and conclusive as we think it should be in a case of this character, in order to justify the issuance of a perpetual injunction. . . . . Such injury must be material and actual and not fanciful, theoretical or merely possible."

Thus the court held there, that further evidence should be taken before an injunction would be granted, but the findings and conclusions herein are sufficient to meet the stated requirements in the quoted case.

In regard to surface water it is statutory that an appropriator, prior or subsequent, may not change his point of diversion to the injury of another appropriator. (I. C. A., sec. 41–108; *Bennett v. Nourse,* 22 Ida. 249, 125 Pac. 1038; *Hall v. Blackman,* 22 Ida. 556, 126 Pac. 1047.) And this principle is applicable herein.

One of the witnesses for appellants testified as follows:

"A. It was my opinion that if the pump was set down to 90 feet—not the present one—that would be beyond its effective range—but if a pump were set down 90 feet in the well, and designed to raise his original quantity of water, and provided with a thirty horsepower motor to drive it, it would produce the water at that level, and it was my conclusion that the well would also produce that water at that level, but not lower than that level while the other pumps around there were running. I would like to qualify that statement by saying that that could only represent my best judgment, and that is that it would do so. You will remember yesterday I testified in answer, I believe, to your question, that in case such a pump were put in to get the original quantity of water at some new unexpected and hoped-for level that you might still miss it;

but with the pump there installed to obtain that, you could test the performance of the well down to the limit of that pump and in such manner that you could test the performance of the well, and should be able, with not more than one alteration to this 90 foot pump, to hit the thing square on high.

"Q. What would be the reasonable cost of such an installation?

"A. I figured it at $1,623.00 complete with the electrical equipment necessary.

"Q. That would provide the pump and its installation and the motor for driving the pump?

"A. Yes, sir."

It is thus apparent that it is a controversy between appellants and respondents as to who will bear the expense of lowering respondents' pumps, so they will receive the same amount of water as before, and any expense involved herein for such purpose must fall on appellants and not on respondents. (*Hill & Gauchay v. Green,* 47 Ida. 157, 274 Pac. 110.)

In the instant case, the body of water tapped by respondents' and appellants' wells is depleted perpendicularly by appellants' wells.

If appellants may now compel respondents to again sink the well, to a point below appellants, to again receive the amount of water heretofore used, it would result ultimately in a race for the bottom of the artesian belt. As note the testimony of Merritt and Hayes.

"Q. Yes. Now, if the column of the pump on the Noh west well were extended 25 or 30 feet, or better, so as to put the bowls of the pump down below the water, and the motor in the pump on that well increased in capacity, what, in your opinion, would result from the operation of that pump and what effect, if any, would it have upon the Stoner well?

"A. That pump might be increased in size also to pump a capacity that the present pump was pumping before the Stoner well started. If that was the case it is my opinion that the Stoner well would immediately be affected.

"Q. And in order to have the Stoner well, then, produce the same flow of water that it is producing, ultimately what would have to be done?

"A. It would go down low and take it away from the Noh well again.

"Q. Resulting in a sort of tug of war—

"A. Yes, sir, alternating and lowering until there is no limit—a man's finances would be the limit."

"A. The efficiency of the pump would be decreased and the cost of pumping would be increased; and the drawdown, of course, would be affected there. As a matter of fact, the whole situation would be changed.

"Q. Then, Mr. Hayes, assuming that the pump were extended to a lower level—another column added to the pump, and the capacity of the pump and the motor, on the Noh west well, should be increased, what condition, then, would result?

"A. Well, it would be—the effect on the basin increment would be marked; there would be, probably, a greater discharge from the basin, which, in my opinion, would immediately affect the discharge of the Stoner well, and it would just be—if one were lowered at one time and another at another time it would just be see-sawing back and forth."

If subsequent appropriators desire to engage in such a contest the financial burden must rest on them and with no injury to the prior appropriators or loss of their water. Otherwise if the users go below appellants and respondents were to go below them, appellants would in turn, according to their theory, be deprived of their water with no redress.

Appellants urge that the court restrained the use of the Stoner well in connection with the Noh east well when no interference by the former with the latter was shown.

The decree provided that appellants must refrain from interfering with the 2 8/10 cubic feet, or 140 inches of water respondents should receive; obviously respondents are entitled, so far as appellants are concerned, only to the amount of water they pumped prior to the time appellants

sunk their well. And the trial court's decree no doubt will be and should be given in such effect.

Judgment affirmed in accordance with the opinion herein. Costs to respondents.

Budge, C. J., and Holden and Wernette, JJ., concur.

Morgan, J., dissents.