344 P.2d 528

CURRENT CREEK IRRIGATION CO., a corporation, Plaintiff and Appellant,

v.

Orville ANDREWS, Defendant, Respondent and Cross-Appellant.

Orville ANDREWS et al., Plaintiffs, Respondents and Cross-Appellants,

v.

CURRENT CREEK IRRIGATION CO., a corporation, et al., Defendant and Appellant.

Gerald FOWKES et al., Plaintiffs, Respondents and Cross-Appellants,

v.

CURRENT CREEK IRRIGATION CO., a corporation, et al., Defendants and Appellants.

No. 8745.

Supreme Court of Utah.

Oct. 1, 1959.

Clyde & Mecham, Salt Lake City, Robert B. Porter, Deputy Atty. Gen., for appellant.

Carvel Mattsson, Richfield, E. J. Skeen, Salt Lake City, Christenson, Novak & Paulson, Provo, for respondents.

WADE, Justice.

Three cases are consolidated involving claims to water rights in various wells and springs in an underground water basin near Mona, Juab County, Utah. It is unnecessary at this point to detail the claims and counterclaims, appeals and cross-appeals. The position of the parties on the issues involved will be apparent. We group them according to their interests, and refer to them as Andrews (Orville Andrews, et al.), Fowkes (Gerald Fowkes, et al.), Current Creek Co. (Current Creek Irrigation Co.), and the State Engineer.

The central problem is whether prior appropriators of water from an underground basin, who receive it by means of flowing wells and springs, have a vested right to continue receiving water by artesian pressure; and whether subsequent appropriators, whose withdrawals of water lower the water table and reduce the flow of prior wells, must restore the pressure or bear the expense of replacing the water of prior appropriators.

All of the wells and springs belonging to the parties are on a single broad alluvial fan, which slopes westward from the Wasatch Mountains, in north Juab Valley. The valley is bounded on the east by those high and rugged mountains, including Mount Nebo, which dominates the area from its 12,000 foot height, and on the west by a lower range referred to as the West Mountains; it is closed at the south end by the Levan Ridge and on the north by a natural ridge.

The alluvial fan on the east side of the valley is built of sands and gravels which have been carried from the mountains by streams and water drainage over many thousands of years; and similar materials deposited there by the currents of Lake Bonneville, which covered the valley at one time. These relatively loose materials be-

come saturated as moisture seeps into the ground from the heavy snow and rainfall in the mountains, and readily carry the moisture beneath the surface downward toward the water basin in the center of the valley. These strata and the basin itself are the sources of the waters with which we are concerned.

Fowkes are owners of 11 artesian wells and one spring which are located well up eastward on the alluvial fan and toward its northern part: the use is for domestic purposes and for irrigation of approximately 115 acres of land. Their rights rest upon claims filed in the State Engineer's office ranging in priority from 1902 to 1922. In addition thereto, Fowkes claim the right to water from springs and seeps or subirrigation of certain lower pasture lands, which use antedates the Water Filing Act of 1903.

Andrews are the owners of a spring and five flowing wells located roughly one-half mile southeast of the Fowkes wells and therefore higher on the fan, which are used to irrigate about 150 acres of land. They date to 1915 or before but are later in priority than the Fowkes wells. Andrews also own the right to use water from a number of seeps and springs which irrigate meadow land and which also have been so used since before 1903. They have further initiated a claim as of March 14, 1950, for a pump well which produces six second feet of water. This was by application to the State Engineer and use is permitted only during the irrigation season.

Current Creek Company's main water source is known as Mona Reservoir, which lies at the center of the valley near its north end. The water is transported about 12 miles to the south for irrigation. The company has also initiated a claim to appropriate 18 second feet of underground water to be pumped from three wells near the reservoir to augment its supply. However, when these wells were drilled they did not produce the anticipated flow, and Current Creek applied for and received approval from the State Engineer to change the location of these wells eastward and higher up on the fan, and to add two additional wells. Thereafter Current Creek contracted with Andrews to permit the drilling of two wells on the latter's property. The new wells produced a better flow of water. The priority date of application for these wells is 1951, although they were not drilled until 1954. They flow by natural pressure about 2.74 second feet of water and are allowed to flow during the entire year for storage in the Mona Reservoir.

This basin upon which all of the wells are situated is classified as a sensitive "cone of influence," because the wells readily affect each other. That is, when the Andrews' pump well is started, the water level drops and the pressure ceases in Andrews' other wells, and in the wells owned by Fowkes; when the pump well is turned off

the level pressure rises in the others. Opening and closing the Current Creek Company's wells has the same, although somewhat less, effect. The evidence indicates that the hydrostatic pressure in the Fowkes' and Andrews' flowing wells decreased from about 11 feet above ground in the beginning of 1953 to about 8.5 feet below ground in October, 1956. During the summer of 1956, studies by the State Engineer and the U. S. Geological Survey showed that operation of the Current Creek Company's wells diminished the flow of other wells in the area.

When the operation of the Current Creek wells resulted in stopping the flow in the Fowkes' and Andrews' flowing wells, which had never occurred before, Andrews closed the Current Creek wells on their land and insisted that they be kept closed or damages paid. This is in accordance with Andrews' contention as to the terms of their contract. Current Creek's rejoinder is that it was not their wells, but Andrews' own pump well that depleted the Andrews' and Fowkes' flowing wells, and they also assert that Andrews and Fowkes have no absolute rights to artesian pressure, but must use reasonable means and pumping equipment to get their water.

The summation of the various charges and countercharges the parties make against each other is that each insists upon, and seeks to have declared, its absolute rights to obtain the water it claims, without interference from the other, and asks injunctive relief to protect such claimed rights. Attack is also made upon the action of the State Engineer in allowing Current Creek to change locations of its wells which was done over the protest of both Andrews and Fowkes.

The trial court found that the relative time priorities of the parties to the water in the basin were: (1) springs owned by Andrews and Fowkes, (2) the flowing wells of Andrews and Fowkes, (3) the Andrews' pump well, and (4) the Current Creek Company wells. It declined to determine priority as to the other water sources, including a railroad well, and certain seeps in the lower valley; and we think correctly so because the evidence with respect thereto was inconclusive. The court found that there is unappropriated water within the basin and therefore affirmed the State Engineer's approval of the change of location of the wells of Current Creek Company; as to Andrews' act in closing the Current Creek wells, it issued a decree enjoining them from interfering therewith, based upon the fact that matters as to administration and distribution of water are by statute vested in the State Engineer.

The court further found that the pump wells of both Andrews and Current Creek interfered with the flow of the flowing wells of Andrews and Fowkes. As to Andrews, it refused to find that the interference in their flow well was caused by the Current

Creek wells, as distinguished from the effect caused by their own pump well, and therefore refused to allow them any redress. The decree required Andrews and Current Creek Company to replace for Fowkes 1.775 second feet of water during the irrigation season and 27.11 gallons of water per minute during the nonirrigation season to be supplied by furnishing and installing pumps and sources of power, the cost to be shared equally between them. It further prohibited Andrews and Current Creek from using their pump wells and required them to desist from pumping water until and unless they replaced the water to Fowkes as just stated. The court, however, refused to grant damages to Fowkes on the ground that they failed to prove damages and failed to mitigate any damage that might have inured to them.

Prior appropriators of this underground water who have beneficially used it through the natural flow of springs or artesian wells are entitled to have the subsequent appropriators restrained from drawing the water out of and lowering the static head pressure of this underground basin unless they replace the quantity and quality of the water by pumping or other means to the prior appropriators at the sole cost of the subsequent appropriators. The same rule should apply to all junior appropriators present and future. They can appropriate water to a beneficial use from the underground basin if it is available but they must replace the flow of the wells and springs at the prior appropriator's place of diversion solely at their own cost.[1] Although, as usual in such cases, the facts are very complicated, the effect of the judgment is in accordance with the above statements of the law and such judgment is affirmed.

There can be no doubt that the above is a correct statement of the rules governing this situation. Section 73–3–23, U.C.A.1953, expressly grants the right of replacement to any junior appropriator whose appropriation diminishes the quantity or quality of previously appropriated underground water at the sole cost or expense of the junior appropriator. The wording of this statute is clear, unambiguous and positive. This court has the highest duty to enforce it and not repeal it by judicial legislation. This section was added by the 1935 Legislature with other sections in order to adapt the law to the new concepts that underground waters are subject to appropriation in accordance with the then very recent decisions of Wrathall v. Johnson and Justesen v. Olsen.[2] There can be no doubt that the legislature and this court intended to protect the rights of the prior appropria-

1. For the history of the law on this subject see Hanson v. Salt Lake City, 1949, 115 Utah 404, 205 P.2d 255.

2. Wrathall v. Johnson, 1935, 86 Utah 50, 40 P.2d 755; Justesen v. Olsen, 1935, 86 Utah 158, 40 P.2d 802.

tors, and that both those decisions and this legislation were arrived at and enacted for that purpose.

The doctrine that underground basins of water could be appropriated through artificial flowing wells was first recognized in the Wrathall and Justesen decisions in 1935. But long prior thereto, by an unbroken line of decisions, this court had established that water which escaped by natural means from an underground basin was subject to appropriation, and that the rights of a prior appropriator would be protected against a junior appropriator who by means of wells or tunnels lowered the static head pressure, or by other means prevented the natural flow of the underground basin waters to the surface at the diverting works of the prior appropriator.[3] This was the main basis of the opinion of Judge Bates who wrote the main opinion in the Justesen case. Here part of the water from the underground basin came to the surface by means of natural springs and seeps. As to such waters this court has always protected the rights of the prior appropriators to the static head pressure.

Prior to 1935 we held that percolating waters are a part of the soil and not subject to appropriation,[4] and that underground artesian basins are percolating waters. Still all of our decisions have protected the rights to have the static head pressure maintained. We have consistently enjoined the lowering of the static head pressure which had the effect of preventing a prior user from continuing a beneficial use of underground waters. This was just as true in Horne v. Utah Oil Refining Co. and Glover v. Utah Oil Refining Co.,[5] wherein we applied the correlative rights doctrine, as in the Wrathall and Justesen cases,[6] where we applied the right to appropriate theory. It was also equally true in the cases where the water escaped from the underground basin by springs, seepage or other natural means.[7] Obviously the correlative rights doctrine was made use of to protect prior rights to pressure while giving lip service to the theory that percolating waters are a part of the soil. So in all of these cases, including Hanson v. Salt Lake City,[8]

3. Sullivan v. Northern Spy Min. Co., 1895, 11 Utah 438, 40 P. 709, 3 L.R.A. 186; Herriman Irr. Co. v. Keel, 1902, 25 Utah 96, 69 P. 719; Bastian v. Nebeker, 1917, 49 Utah 390, 163 P. 1092; Peterson v. Lund, 1920, 57 Utah 162, 193 P. 1087; Peterson v. Wood, 1928, 71 Utah 77, 262 P. 828.

4. Crescent Min. Co. v. Silver King Min. Co., 1898, 17 Utah 444, 54 P. 244, 70 Am.St.Rep. 810; Willow Creek Irrigation Co. v. Michaelson, 1900, 21 Utah 248, 60 P. 943, 51 L.R.A. 280, 81 Am.St.Rep. 687.

5. Horne v. Utah Oil Refining Co., 1921, 59 Utah 279, 202 P. 815, 31 A.L.R. 883; Glover v. Utah Oil Refining Co., 1923, 62 Utah 174, 218 P. 955, 31 A.L.R. 900.

6. See Note 2 above.

7. See Note 3 above.

8. Hanson v. Salt Lake City, 1949, 115 Utah 404, 205 P.2d 255.

1949, we recognized the right to static head pressure. We have found no case in this state involving this question where the court has failed to approve the doctrine that the static head pressure of a prior appropriator should be protected. This seems to have been universally recognized in other states.[9]

There are a number of reasons why we should not discard the right of static head pressure in favor of Current Creek. There was evidence that about 52% of the water which flows from its wells is wasted by evaporation, transpiration and seepage. Although this evidence was stricken it was material on the claim advanced by Current Creek that the doctrine of maintaining static head pressure should be abandoned because it is claimed that much more underground water will be beneficially used if each appropriator has to bring his own water to the surface at his own expense. If we are to consider that question, then the facts as they exist in this case as to the percentage of water wasted by Current Creek should be considered. This evidence is more pertinent to this question than the

hypothetical case of what may happen in Milford if we do not abandon the doctrine that if a junior appropriator lowers the static head pressure and thereby deprives a prior appropriator of his underground flow, the junior appropriator must replace such water at his own expense.

In the hypothetical Milford case we are told that 40,000 acre feet of water is being pumped to the surface annually with a static head pressure sometimes as low as 500 feet below the ground surface. It is also claimed that this amount of water is being safely replaced in the basin from year to year. It is further contended that only a small portion of this 40,000 acre feet now being beneficially used could have been so used had the doctrine that the junior appropriator must replace the water of prior appropriators been applied to the development of that basin for the cost would become prohibitive if the junior appropriator only lowered the static head pressure a few inches. On the other hand, if each appropriator has to lift his own water to the surface, more water may be beneficially used. No explanation is made of how this

9. Pima Farms Co. v. Proctor, 1926, 30 Ariz. 96, 245 P. 369; Noh v. Stoner, 1933, 53 Idaho 651, 26 P.2d 1112; City of Lodi v. East Bay Municipal Utility District, 1936, 7 Cal.2d 316, 60 P.2d 439; Faden v. Hubbell, 1933, 93 Colo. 358, 28 P.2d 247; Karl F. Hehl Engineering Co., Inc. v. Hubbell, 1955, 132 Colo. 96, 285 P.2d 593; State ex rel. Crowley v. District Court, 1939, 108 Mont. 89, 88

P.2d 23, 121 A.L.R. 1031. The last three cases cited above deal with lowering the waters of a stream and are somewhat similar to Salt Lake City v. Gardner, 39 Utah 30, 114 P. 147. They are in line with our recent case of Kano v. Arcon Corporation, 1958, 7 Utah 2d 431, 326 P.2d 719, where we awarded damages for lowering the point of diversion of a prior appropriator.

underground basin has been developed under our present system. Maybe such explanation would point to the solution of our problem.

The facts of our present case do not indicate that less water will be beneficially used if we continue to follow the right to static head pressure theory. Before the static head pressure was lowered Fowkes received their water without pumping. Now Current Creek gets more water than Fowkes claims from a lower elevation without pumping. There is no reason to believe that the cost of replacement to Current Creek will be prohibitive but that the cost of pumping to Fowkes will be otherwise. So far as this case is concerned, we have the choice between protecting a junior or senior appropriator with nothing whatever to indicate that more water will be beneficially used one way or the other. It would be a mistake to change an age-old system merely in the hope that in some future case more water may be used beneficially under a different system. This court should not completely change the law and ignore an express statute without a showing that such change would cause more water to be beneficially used.

A system which will utilize all of our water resources can be developed by the use of reclamation projects, water conservancy districts and the rights of eminent domain. Further legislation may aid in implementing these remedies. We should avoid another violent change in our concept of the right of priority in the use of our underground waters without any showing that our present system is inadequate for a full development of our natural resources.

We are not impressed that there is any basis for disturbing any of the findings of fact by the trial court and the various contentions in that regard are rejected.

Assuming that it is deemed proper that Andrews and Current Creek should maintain the flow of water for Fowkes as decreed, without detailing the evidence, there is a reasonable basis therein for the determination made that they should share equally in such expense.

As to the claims for damages, the burden of proof was upon the claimants, and upon the basis of the record we cannot say that the proof was such as to compel awards for damages so claimed, and in such respects the judgment is affirmed.

Judgment affirmed. Costs to respondents.

McDONOUGH, J., concurs.

HENROID, Justice (concurring in the result).

I concur in the result because I believe that under the particular facts of this case, Sec. 73-3-23, U.C.A.1953, is controlling.

WORTHEN, J., heard argument but died before opinion was filed.

CROCKETT, Chief Justice (dissenting).

Because of my doubts as to the correctness of the rule espoused in the opinion of Justice Wade, and the perplexities attendant upon the allocation of rights in underground waters, I desire to express some ideas on this subject which are not touched upon therein.

The difficulty with his opinion is that it appears to be grounded upon the assumption of an absolute right in a prior user of underground water to have not only the water, but also to have the pressure and the means of diversion preserved inviolate.

It seems to me that it is always an illusion to regard any right as absolute. A right may be so assertable under some circumstances, but not under others. All rights in property, and personal liberties, or even the right to life itself are subject to limitations, or to forfeiture under certain conditions.

Because our state is comparatively dry and arid, from the earliest times it has been the policy of our law to encourage in every possible way the discovery and development of water and the broadest and most continuous application to useful purposes. There is no resource more vitally affecting the public interest than the waters of our state. It is clearly established by both statute and decisional law that all water resources, including underground water diffused in the soil, belong to the public,[1] and the rights to use it are appropriable by private individuals only to the extent and under conditions prescribed by law.[2] Inasmuch as these rights are assured and protected by the authority of the state, it is both logical and necessary that they be deemed to be held subject to such conditions and limitations as are established by law for the general good.

It is because of the foregoing that I doubt the wisdom of seeking solutions to problems such as the instant ones in such a generality as a rule that a prior user has the absolute right not only to the water, but to have preserved to him the pressure and the means of diversion under all circumstances. Such a rule may seem easy for the court to apply to rid itself of immediate problems, but it is far from easy in practical operation. More important, it does not serve the fundamental purpose of our water law of providing for the fullest conservation and the highest development of water by making it available to all users in the most convenient and economical way. The rule is impractical because in some instances it would produce these bad effects: (1) it would compel wasteful exposures at and near the surface and/or wasteful drainage from the basin; (2) the foregoing would result be-

---

1. Sec. 73–1–1, U.S.A.1953; Riordan v. Westwood, 115 Utah 215, 203 P.2d 922.

2. Sec. 73–3–1, U.C.A.1953.

cause in some instances it would be too expensive for later users to pay the cost of lifting their own water and also to bear the expense of maintaining pressure for all prior appropriators; and (3) the problem of administering the allocation of the costs of doing so would be insuperable.

Reference to the decisions of this court will reveal that it has in the past reasonably and properly adjusted the rules of law to meet problems as they arose pertaining to the use of water. When contention first arose as to rights in underground waters the view was entertained that water was part of the soil, and that the ownership of it was absolute in the property owner. An early decision on underground water, Sullivan v. Northern Spy Min. Co.,[3] held that one discovering and improving percolating waters on public land by such act acquired the permanent right to use such water, which became an easement against a later owner who acquired the land from the government. But the court stated by way of dictum that percolating waters were not to be treated the same as other waters after the land becomes privately owned because they then belong to the landowner, and

further: "this right of an appropriator is, of course, subject to the rule of law which will permit the owner to sink an adjoining well on his own premises, although he should thereby dry up that of the first appropriator." This rule of absolute ownership of percolating waters by the landowner was applied in holding that when he commenced the use of a well on his own land, he had a right to it even against adjoining owners who had wells prior in time.[4]

The impracticability and unfairness of permitting a later well digger to take the water from an earlier one was realized and the court used its good sense and ingenuity in dealing with the problem by departing from the ancient idea of absolute ownership with the land by requiring a reasonable and beneficial use of water.[5] Thereafter a rule known as "correlative rights," was applied. It is clearly stated in Horne v. Utah Oil Refining:[6]

"* * * where the water is put to a beneficial use, each party in the artesian district, if the water is necessary for his use, is entitled to a proportionate share according to his surface area as compared with the whole."

3. 11 Utah 438, 40 P. 709, 710, 30 L.R.A. 186.

4. Crescent Min. Co. v. Silver King Min. Co., 17 Utah 444, 54 P. 244, 70 Am.St. Rep. 810; Willow Creek Irrigation Co. v. Michaelson, 21 Utah 248, 60 P. 943, 51 L.R.A. 280, 81 Am.St.Rep. 687.

5. Herriman Irr. Co. v. Keel, 25 Utah 96, 69 P. 719; Garns v. Rollins, 41 Utah 260, 125 P. 867.

6. 59 Utah 279, statement quoted made on rehearing at page 305, 202 P. 815, 825, 31 A.L.R. 883.

The doctrine that rights to use underground waters must be correlative to the surface area owned and reasonable use in connection therewith prevailed until the Wrathall v. Johnson[7] and Justesen v. Olsen[8] cases in 1935, in which the court announced that although the 1903 water filing act had not theretofore been construed as applicable to underground water, such water in defined underground artesian basins or channels were public waters and subject to that act. But it was implied that other waters diffused in the soil and not so classified were still not appropriable under the act.

The two cases just referred to made suggestions for legislative changes. Pursuant thereto the legislature made these amendments and additions:

Sec. 100–1–1, R.S.U.1933 (now 73–1–1, U.C.A.1953) was amended to read: "All waters in this state, whether above or under the ground are hereby declared to be the property of the public, subject to all existing rights to the use thereof."

Sec. 100–3–1, R.S.U.1933 (now 73–3–1, U.C.A.1953) was amended to read: "Rights to the use of the unappropriated public waters in this state may be acquired only as provided in this title. No appropriation of water * * *

shall be recognized except [upon] application * * * to the state engineer * * *."

In Riordan v. Westwood[9] it was held that underground water had always been public water and the earlier cases holding there was absolute ownership in the owner of the land were wrong.

The effect of the view represented by the majority opinion is that the pendulum of the law relating to underground waters has by a somewhat tortuous process swung from the pristine view that the landowner had absolute right to the waters in his soil to the opposite extreme that the prior user has absolute and inviolable rights in the water. I subscribe to neither of these extremes, but believe the principles upon which a fair and practicable method of allocating and administering rights in underground waters is to be found somewhere in between them.

The difficulty with preserving to the prior user the absolute right to water and also to the pressure and means of diversion is that projecting its application to basins where there are a great number of users reveals that it does not work to serve the necessary purpose of maximum development and use of water. The evidence indicates and it is a well-known and observable fact, that

---

7.  86 Utah 50, 40 P.2d 755.

8.  86 Utah 158, 40 P.2d 802.

9.  Footnote 1, supra.

when the water table of an underground basin is maintained at a high enough level to sustain pressure in flowing wells in the higher areas, there will be water above and near the surface in the lower areas forming ponds, marshes and swamps. This results in wasteful losses from surface evaporation and from consumption by water-loving plants, tules, reeds and rushes, indigenous to such areas, which are of little or no value. There is often further wastage from drainage of the basin by streams or by leakage and seepage out of it.

Under a rule of absolute right to water and pressure, there are other difficulties to be encountered in allocating all the usable water to users. This can best be explained by an example suggested by counsel: suppose a given district, such as the Milford district, covers an underground water basin of about 90 square miles, and that it has about 125 wells pumping which annually withdraw about 40,000 acre feet, lowering the water table about 40 feet. The priorities of the 125 wells would, of course, be at scattered dates. Suppose further that there is still unappropriated water in the basin. Each new appropriator would have the effect of causing some additional reduction in the water table, and each would have to pay tribute to that extent to each of 125 prior appropriators. Furthermore, as additional well owners were added, it would become increasingly more complicated and difficult, perhaps impossible, to determine just whose well caused the water table to drop, and how much; and likewise whether it impaired the flow of others, and to what extent. The administrative problems relating to the determination of costs of maintaining pressure for prior users, and allocation against later users, would be insuperable. In addition thereto the cost imposed upon the initiator of a new well might be prohibitive, so that even where there was unused water in the basin it would not be put to use. The various difficulties just discussed make it apparent that it is quite impractical to insure to prior appropriators not only the amount of water they claim, but also the right to have the same pressure maintained as when they made the original appropriation.

In any approach to determination of rights in underground water it is necessary to get rid of any illusions about the quantity of water available and to face the fact that no water is created by simply driving pump wells deeper and deeper and pursuing the water level down in the basin. The water is replenished only from surface sources. Primarily it must come from precipitation, but it may also flow or drain into the basin from other areas. The replenishment provides only so much water in any year's water cycle. This is aptly referred to as the "average annual recharge."

The underground basin may be likened to any surface lake or reservoir. If the users take more than the recharge, the result is

that they have to compete with each other in pursuing the water table down by digging deeper and deeper wells to pump it away from each other. It is obvious that this becomes a vicious circle of competition, ever more burdensome and expensive and without any advantage except a temporary one to the user with the deepest well, until someone digs below him, or to the one with the most money and determination to grab the water away from others. This would result finally in pursuing the lake, reservoir or water table down to its bottom, where there would be available only the amount of the annual recharge anyway. The sensible and practical thing is to have a determination made of what the annual recharge of the basin is, based on a study of a sufficient cycle of years, and so allocate the withdrawal of water as to prevent wasteful evaporation or drainage and to keep it from going below some reasonable level which would keep down the difficulty and expense to users in obtaining their water. This would correlate with recognition of rights and allowance of withdrawals on the basis of priority in the same general pattern as is followed with respect to rights in surface waters. Well owners would be allowed to draw the water down to the level which would be the most practical and economical for all users.

In approaching the desired objective the users may have to vary their means of di-version or to put forth such effort as the State Engineer may determine to be reasonably necessary to get their water. In a surface reservoir, for instance, while the various water users are entitled to their water, no particular user is entitled to a vested right in a full reservoir. All must cooperate reasonably so that all the water may be used. Only by so managing the underground water table can the Engineer obtain the highest potential of the water in the basin. It seems a good deal more practical and reasonable for each to be required to extend some cooperation than to permit some prior user or users to insist upon pressure under all circumstances in a "dog in the manger" way so as to make it impractical and perhaps impossible for later users to get the benefit of unappropriated water.

It is appreciated that such supervision and management of water in a basin would present difficulties and perhaps could not be accomplished to perfection. Nevertheless, if the purpose of our water law of obtaining the fullest and best use of water is to be accomplished, these difficulties must be faced up to and dealt with by the best means at our command. The legislature has recognized the technical difficulties inherent in the allocation of waters and has given the State Engineer, who is best qualified for the task, the duty of general administrative supervision of waters of the state

and the measurement, appropriation, apportionment and distribution thereof.[10]

In fairness I must concede that the language of Sec. 73-3-23, U.C.A.1953: "* * * In all cases replacement shall be at the sole cost and expense of the applicant" may reasonably be given the meaning espoused by the majority opinion. But that is only half of the sentence; it continues, "* * * and subject to such rules and regulations as the state engineer may prescribe." However, the preceding language, which provides the foundation for "replacement" states, that "the right of replacement is hereby *granted* to any junior appropriator whose appropriation may diminish the quantity or injuriously affect the quality of [prior] appropriated underground water. * * *" (Emphasis added.) Thus *granting* the junior appropriator the *right* of replacement does not necessarily make it mandatory that he maintain pressure and means of diversion under all circumstances. I do not regard the case of Hanson v. Salt Lake City [11] referred to in the main opinion as so holding. The court was much concerned about the difficulties involved in giving Hanson, a senior appropriator, absolute right to water and pressure, and he was refused redress against the city for interference with the flow of his well. I agree that this was based partly on the fact that he had not established the right to as much

water and pressure as he claimed and that he was actually getting adequate water by means of a pump. A reservation was expressed as to whether a prior appropriator could use waters inefficiently and deprive others of them. My interpretation of that case is that the prior appropriator gets the right to use the water and to such means of diversion as is reasonably efficient and does not cause undue waste of water.

It is of vital significance, insofar as the authority of the Hanson case is concerned, that Justices Wolfe and Latimer in concurring opinions pointed out that prior appropriators of underground water should not be deemed to get an absolute right to pressure, but only to the water; and that the means of diversion must be reasonable and consistent with the state of development of water in the area and not inimical to the overall purpose of putting all of the usable water in the basin to use. In a special concurrence in the result, Chief Justice Pratt in different words concurred with that conclusion saying, "The rule as to reasonable and economical use of water applies as well to methods of diversion as it does to the application of the water to the land itself." These observations were made in apprehension of the very problems that have arisen in this case. As I view it they are not inconsistent with the statute and are in conformity with the basic objective

10. Sec. 73-2-1, U.C.A.1953, et seq.; Sec. 73-4-1 et seq.

11. 115 Utah 404, 405, 205 P.2d 255, 265.

which must necessarily underlie our water law.

Where uncertainty exists as to the meaning of a statute it should be interpreted in the light of its background and purpose as a guide to giving it proper application.[12] Consideration of those factors leads me to the conclusion that the most logical and practical application of the statute would be to leave the detail of such administration to the State Engineer as is indicated by the statutes giving him the broad supervisory powers hereinabove referred to, with any arbitrary action subject to correction by the courts.

Our statutes set forth a method by which the court can, if it so desires, acquire additional data and information necessary to make such determination. Sec. 73–4–1, U. C.A.1953, provides:

> " * * * In any suit involving water rights the court may order an investigation and survey by the state engineer of all the water rights on the source or system involved."

and with respect to the duties of the Engineer:

> " * * * After full consideration of the statements of claims, * * * surveys, records, and files, and * * * examination, of the river system or water source involved, * * * the

state engineer shall formulate a report and a proposed determination of all rights to the use of the water of such river system or water source [and] shall distribute the waters from the natural streams or other natural sources in accordance with the proposed determination. * * *" 1953 Comp. § 73–4–11.

It may well be that the decree ordering defendants Andrews and Current Creek to replace water in the wells of Fowkes would be correct even under the doctrine espoused in this opinion. However, the decree does not appear to be based thereon, but rather to be grounded upon the rule that prior users have an absolute right to pressure and means of diversion as well as to the amount of appropriated water. As hereinabove indicated, I·think that rule is neither susceptible of practical application nor in conformity with the purpose and intent of our statutes. It should be subject to such "rules and regulations as the state engineer may prescribe" [13] as necessary to the accomplishment of the fundamental objective of water regulation as herein expressed. I would therefore remand the three subject actions to the district court to consider whether the decree entered is in conformity with the views herein expressed, and to either affirm or modify the decree accordingly.

---

12. See Bateman v. Board of Examiners, 7 Utah 2d 221, 322 P.2d 381.

13. From Sec. 73–3–23, U.C.A.1953.