STATE ᴇx Rᴇʟ. CROWLEY, Rᴇʟᴀᴛᴏʀ, *v.* DISTRICT COURT
ET ᴀʟ., Rᴇsᴘᴏɴᴅᴇɴᴛs.

(No. 7,923.)

(Submitted January 14, 1939.   Decided March 11, 1939.)

[88 Pac. (2d) 23.]

Mr. *Wellington D. Rankin* and Mr. *Arthur P. Acher,* for Relator, submitted a brief; Mr. *Rankin* argued the cause orally.

*Messrs. W. H. Hoover, J. V. Dwyer, J. E. Corette, Jr., J. C. Hauck* and *L. V. Ketter,* for Respondents, submitted a brief; *Mr. Hauck* and *Mr. Ketter* argued the cause orally.

MR. CHIEF JUSTICE JOHNSON delivered the opinion of the court.

This is an application for a writ of supervisory control or other appropriate writ, directing the district court of the sixth judicial district, in and for Gallatin county, and the judge thereof, to revoke an order sustaining defendants' general demurrers to the second, fifth and eighth causes of action in plaintiff's amended complaint in a cause entitled *John Crowley* v. *Montana Power Company et al.,* and to overrule the demurrers. The suit in question is for damages for alleged interference with plaintiff's use of irrigation water from the Madison River in 1935, 1936 and 1937. There are nine causes of action, which are grouped as to years. The first three relate to 1935, the next three to 1936, and the last three to 1937. Thus there are three causes of action with reference to each of the three years.

The first group, comprising causes numbered 1, 4 and 7, is based upon the allegation that the defendants had by their dams wrongfully impounded the entire natural flow so that no appreciable amount flowed in the river at plaintiff's point of diversion, and that as a result he could not have obtained his irrigation water even by means of a pump, and was thereby prevented from irrigating his crops. The demurrers to these causes of action were overruled, and no question is raised concerning them.

The third group, comprising causes numbered 3, 6 and 9, is based upon the allegation that the defendants had by their dams alternately impounded and released water of the natural flow, causing such fluctuations at plaintiff's point of diversion that his wing dam and ditches could not be regulated adequately and his use of irrigation water was thereby prevented alternately by insufficient water, and by so much water that his

dam and ditches were washed out. The demurrers to this group of causes were also overruled, and no question is raised relative to them.

The second group, comprising causes 2, 5 and 8, is based upon the allegations that the defendants impounded by their dams the entire natural flow of the river so that the water level at plaintiff's point of diversion was so low that he could not divert water into his ditches by his diversion dam, although the latter was suitable and efficient for the purpose and was a reasonably adequate means of diversion, and reasonably constructed and maintained to divert water from the river to plaintiff's land in spite of the fluctuations in flow incidental to the reasonable and lawful use of water by all persons lawfully entitled to use the same. The exact allegations relative to these points will be set forth below. The demurrers to these causes of action numbered 2, 5 and 8 were sustained, and the questions here are whether causes of action are stated, and whether under the circumstances a writ of supervisory control should issue requiring the order to be revoked and the demurrers overruled.

The essential difference between the first group of causes, which were held good on demurrer, and the second group, which were held bad, is that in the first it is alleged that by reason of defendants' acts there was no appreciable flow of water available for plaintiff's use even by pumping, and that in the second it is alleged that by reason of defendants' acts the flow was so reduced that plaintiff could not divert his appropriate water by his reasonably adequate and long established diversion system, and could not have diverted it without large expenditures for the construction of a new system which would divert any water, however little, flowing at that point.

The causes of action in question here include the allegations usual to this class of cases relative to plaintiff's ownership and possession of land, the irrigable nature thereof, its need for water and its ability to produce valuable crops with irrigation, the appropriation of 200 inches of water from the river in 1885 by plaintiff's predecessor to irrigate the lands by means of diversion works and ditches, the continued diversion and use

of water for beneficial purposes on the land since the appropriation, the appurtenance of plaintiff's water right to the land, and the construction and maintenance by plaintiff and his predecessors of a wing dam extending out into the river to divert water into their ditch.

It was further alleged that the defendant corporation at the times mentioned maintained and controlled the Hebgen and Madison River Dams above plaintiff's point of diversion to store water; that the defendant Buck, as vice-president and general superintendent of defendant corporation, had control of the operation of the dams; that at all of these times the natural flow was sufficient to supply the rights of plaintiff and all prior appropriators for irrigation purposes, and that plaintiff's rights were prior to those of defendant corporation in point of time.

It was also alleged that during the times in question the defendants wrongfully impounded and stored the waters of the entire natural flow of the river by means of the dams, thereby so reducing the flow and the water level at plaintiff's diversion point that water could no longer be diverted into plaintiff's ditches by his diversion system.

The allegations relative to plaintiff's diversion system are: "That at all of the times herein mentioned the plaintiff maintained a wing dam constructed of brush, rocks and dirt extending into said Madison River at the head of his diversion ditch whereby the waters of said Madison River were diverted into said ditch, and conveyed thereby by gravity flow a distance of several miles to plaintiff's said lands; * * * that said means of diversion * * * was suitable and efficient for the diversion of water from said Madison River into plaintiff's ditches, and to his said lands, and has been and at all of the times herein mentioned was a reasonably adequate means of diversion and reasonably constructed and maintained to divert water from said river to said plaintiff's lands notwithstanding the reasonable fluctuations in the flow thereof incidental to the reasonable and lawful use of the waters thereof by all persons and corporations lawfully entitled to the use

thereof, and constructed and maintained to withstand the changes in the flow of said river incidental to the reasonable and lawful use of the waters thereof by said plaintiff and all others entitled to the use thereof including the said defendant corporation; * * * that if said defendants had not impounded and stored water of the natural flow of said Madison River as aforesaid, the level of the water in said river would have been sufficiently high to be diverted into plaintiff's ditches and on to his lands with the reasonably suitable and adequate means of diversion employed by said plaintiff; that said flow of said Madison River was so reduced from time to time by said defendants as hereinbefore set forth that the diversion works and ditches used by said plaintiff as hereinbefore described were rendered useless and of no value to divert water remaining in said river at the plaintiff's point of diversion into plaintiff's ditches and upon said plaintiff's lands, and plaintiff was thereby prevented from irrigating his crops at times when water was necessary for his crops; that when the flow of waters was so reduced by said defendants as aforesaid said plaintiff did not and could not have diverted water from said river without the expenditure of large sums of money, the exact amount of which is to plaintiff unknown, in the construction of a new diversion system so that any amount of water, however slight, flowing in said river which reached the plaintiff's point of diversion could have been utilized and diverted into plaintiff's ditches or by the installation of a pumping plant whereby the waters of said river could be pumped from said river into plaintiff's ditches; that to compel plaintiff to construct such diversion works would place an unreasonable burden upon the plaintiff and compel him to incur expense in an unreasonable and excessive amount to utilize the waters of said Madison River, all as the necessary consequence of the wrongful and oppressive acts of said defendants hereinbefore set forth and described.''

The petition for the writ sets forth as exhibits copies of the amended complaint, the demurrer and the district court's ruling on the demurrer. It recites as the grounds of the petition that the plaintiff must incur great expense in preparing for trial,

that the proof in support of the allegations of the six remaining causes of action will require the attendance of a large number of witnesses, that many of them would be the same witnesses who would testify with respect to the allegations of the three causes of action to which the demurrer was sustained, that the mistake of law complained of ''will inflict a gross injustice upon your petitioner if he is compelled to proceed to trial upon said amended complaint with three causes of action stricken therefrom for the reason that the allegations of said causes of action would be sufficient to authorize a recovery against said The Montana Power Company and M. E. Buck if proven by a preponderance of the evidence, even if the petitioner should be unable to establish by a preponderance of the evidence the allegations of the causes of action to which the said demurrer has been overruled; that a remedy by appeal after final judgment is wholly inadequate and the denial of a speedy remedy would be tantamount to a denial of justice.''

Respondents interposed a motion to quash and dismiss the application, and, without waiving the motion, filed a return and answer, admitting that the complaint was as shown in the application but denying that the causes of action in question state facts sufficient to constitute causes of action, and setting up as an affirmative defense that the petitioner is estopped from questioning the validity of the order sustaining the demurrer, for the reason that he had requested and obtained from the court an order granting him thirty days in which to file a second amended complaint. A copy of the order is annexed to the return and answer as an exhibit.

The reply to the return and answer puts in issue the question of estoppel. It denies that by the order petitioner obtained the right to file a second amended complaint, and alleges that by it he merely obtained an extension of the time in which to file such complaint if he chose; it alleges further that Court Rule No. 6 of the Sixth Judicial District provides as follows: ''When a demurrer or motion to any pleading is sustained or overruled, the adverse party shall have 10 days in which to an-

swer or amend, unless a shorter or longer time shall be fixed by the court in the order sustaining or overruling the demurrer.''

The first question involved in this proceeding is whether by ██ obtaining the order petitioner waived his right to question the ruling on the demurrer. Defendants' contention is that when the demurrer was sustained, petitioner was required to elect whether to stand upon the amended complaint or to apply for leave to amend further; that by his application he obtained a right to amend which he did not have as a matter of course, and that by so doing he elected his remedy. However, it is clear that he already had that right by virtue of Court Rule No. 6, which provided that upon the sustaining of a demurrer the adverse party should have 10 days in which to amend unless other time was fixed by the court. Under the rule the petitioner clearly had the right to amend further if he chose to do so. What he applied for and received was not the right to amend, but further time in which to exercise that right if he so desired.

It seems well settled, and defendants concede, that where the right to amend is granted by statute there can be no election by which the litigant is estopped. Manifestly it is immaterial that the right was granted by general court rule rather than by statute. By his motion for additional time applicant made no election of remedy by which he is precluded from questioning the ruling on the demurrer. As a matter of fact, he has made an election just the reverse of that assumed by defendants. The mere making and granting of a request for time to amend, or even for leave to amend, cannot properly be held to constitute an election to follow that remedy, in view of the well-established rule in this and other jurisdictions that an election exists only where a remedy is pursued to a final conclusion. Here the petitioner did not further amend and thus pursue the remedy to a final conclusion. Defendants are in error in contending that when the demurrer was sustained, petitioner was required to elect whether to stand upon the amended complaint or to apply for leave to amend further. He was required to elect whether to stand upon the amended complaint or to

amend further, and by this application he has elected to follow the first course.

We thus come to the question whether the sustaining of the general demurrers to the three causes of action constituted error.

The allegations of the causes are those usual to actions of this kind. Defendants' contentions are that plaintiff has no cause of action merely because their acts so reduced the flow that he could not divert his appropriated water by his reasonably efficient diversion system; that he should have alleged that not enough was left to permit his diversion without leaving any water in the stream. In other words, they contend that plaintiff has no cause of action if there are 200 inches of water at his point of diversion, even though he cannot get the water into his ditches without a pump; that an appropriator's vested interest is only in the use of the quantum of water appropriated by him without reference to his means or manner of diversion, however reasonably efficient; that not reasonable efficiency but absolute efficiency is required. To this theory we cannot assent without doing violence to the entire principle of water rights by appropriation. If it is to be followed, there are few, if any, irrigation water rights in the state of Montana, however long established, which could not in effect be destroyed entirely by subsequent appropriations. One hundred per cent. efficiency can be furnished by no system of diversion, and certainly by none financially available to the average water user. The law does not defeat its own end by requiring the impossible. The marginal character of many farming enterprises, and especially of the smaller ones, is well known, and if defendants' argument is followed, vested interests will be seriously affected and rights limited by the necessity of installing diversion systems by which the last drop may be taken from the stream.

There is no question that waste of our water resources must be minimized in the general interest, but it is equally manifest that there is a vanishing point at which the possible waste of water would be more than overcome by the waste incidental to the abandonment of reasonably efficient diversion systems and

the establishment of diversion systems whose expense is neither warranted nor permitted by the benefit to be derived from the water.

It is well established that subsequent appropriators take with ██ notice of the conditions existing at the time of their appropriations. In making their appropriation of storage or other water and their expenditures in connection therewith, defendants and their predecessors were chargeable with knowledge of the existing conditions, with reference not only to the amount of prior appropriations, but also to the existing diversion systems of prior appropriators. They cannot now argue that they are limited by the amount but not the means of prior appropriations, however reasonably efficient under the circumstances, or that so long as they leave the exact amount of plaintiff's appropriation in the river at his point of diversion, they have no further duty and that it is his worry and not theirs how or whether he can divert it upon his land. His right is to divert and use the water, not merely to have it left in the stream bed; that is the essential difference between riparian and appropriation rights.

In *Salt Lake City* v. *Gardner*, 39 Utah, 30, 114 Pac. 147, 152, appellants had appropriated water from Utah Lake by means of natural gravity flow, aided by a storage dam and pumping plant. The question was whether the respondents should be allowed to appropriate and divert water by means of a pumping plant, thus reducing or stopping the gravity flow and placing upon appellants an additional burden for installation and operation of pumps. The court said: "Counsel for respondents, however, insist that the prior appropriator acquires no right in his means of diversion, but obtains a prior right only to use the quantity of water appropriated and applied to a beneficial use by him. We cannot yield assent to this view. We think the original taker or appropriator from a stream or body of water also acquires the right to continue to use his method or means of diverting which he has installed. If this be not so, then prior appropriators, who have appropriated only in small quantities, and whose means of diversion from the stream are simple but

sufficient for their purpose, could have their means made entirely ineffective by a subsequent appropriator of a large volume of water the diverting of which would so lower the stream that the water would no longer reach the point of diversion of the small appropriator. In this way it may well be that the cost to the small appropriator to make the water appropriated by him available for his purpose might under changed conditions be prohibitive if not ruinous. Upon the other hand, the cost of making the change might not be so great as to prevent the larger appropriator from supplying and paying for some means whereby the prior rights to the use of the water appropriated by the small user might be preserved, and the wants of the large appropriator could nevertheless be met and supplied. In this way, perhaps, very large quantities of water theretofore wasted, or used only to aid the original appropriator to obtain his meager supply, would be put to a useful and beneficial purpose without destroying the rights of any one. If it be held, therefore, that a subsequent appropriator of water need have no regard for the diverting means or methods of the prior appropriator, but may in fact or effect make prior appropriations of water unavailable with impunity, then there is in fact no such a right as a prior right, but all rights may, at any time, be invaded or destroyed by a subsequent appropriator by simply making the diverting means used by the prior appropriator useless. To permit such an invasion of a prior right would, in effect, amount to an indirect taking of a prior appropriator's water. This neither the legislative nor the judicial power can allow without permitting confiscation of property rights. * * * If all rights can be protected and preserved, a mere change in prior established means or methods of diversion, if possible, ought not to prevent the use of water which could otherwise not be beneficially applied. But, in our judgment, the risk of interfering with prior rights and the cost of any change in the prior appropriator's means or methods of diversion should be assumed and borne by the subsequent appropriator, and a court should in no case permit a subsequent

appropriation unless all prior rights can by some feasible means be protected and maintained.''

Defendants contend that the case of *Schodde* v. *Twin Falls Land & Water Co.*, 224 U. S. 107, 32 Sup. Ct. 470, 56 L. Ed. 686, affirming, (9th Cir.) 161 Fed. 43, 88 C. C. A. 207, sustains their contention that a prior appropriator has no vested interest in his means of diversion. It cannot be so construed. In that case plaintiff had appropriated 1250 inches of water from Snake River in Idaho, for use on his ranch of 429 acres, and diverted it by means of large waterwheels operated by the stream flow. The defendant thereafter constructed a dam nine miles below to supply water to about 5,000 settlers for the irrigation of approximately 300,000 acres of land. The dam backed the water up beyond plaintiff's waterwheels so that the current was no longer available to operate them. Plaintiff sued for damages in the federal court of Idaho, and defendant's demurrer was sustained. On appeal the ninth circuit court of appeals affirmed the trial court's action on the ground that there was no attempted appropriation of water to run the wheels, and that there could be none under the laws of Idaho without an actual diversion for the purpose, and upon the further ground that the statute expressly authorizing the use of rams and other machines to lift appropriated water from streams gave a mere license, and not an appurtenance to the water right appropriated. In other words, the right to the flow of the river constituted neither an appropriation of the flow nor an appurtenance to the irrigation water actually appropriated. It also held that where the method of diversion was obviously unreasonable and inefficient it could not be used where it interfered with the reasonable use of water by others. Obviously, of course, under the circumstances of that case, it was unreasonable to prevent the irrigation of 300,000 acres by an unusual and inefficient method of diverting water for 429 acres. The complaint there was not that the defendant had taken water out of the stream so as to interfere with the waterwheels; as a matter of fact, the defendant had confined more water there. What it had deprived plaintiff of was not the water, but the

force of the water, which was no part of his appropriation. This can be made clear by an analogy. If, instead of building waterwheels to utilize the force of the stream, he had constructed windmills to employ the force of the wind, it would have been entirely clear that his complaint was not of water right interference, but of something entirely different. If the conditions were such that he could have recovered for an obstruction to the flow of the wind to his windmills, it would still have been something entirely apart from and not appurtenant to his water right. This is clear from the opinion of the circuit court of appeals in 161 Fed. at page 45, as follows: "It is contended on the part of the plaintiff that the current of the river is necessarily appurtenant to the water location and that the means of utilizing that current is attached as an appurtenance to the appropriation. We have not been referred to any case—and we know of none—where either of these propositions has been upheld. The claim that the right to the current of the river is appurtenant to the water location is contrary to well-established principles of the common law governing such a relation. The water location was an appropriation and diversion of a certain quantity of the flowing water of the stream. The current of the river is part of the stream. There can be no right to the current of a stream as appurtenant to a diversion of the flowing waters of the stream. The two rights in such case would be equal and of the same character and quality, and one such right cannot be appurtenant to the other." The court then went on to show that there had been no diversion or appropriation of water for power purposes, so that plaintiff's asserted right against defendant's interference was not a water right, and concluded by quoting the decision of this court in *Fitzpatrick* v. *Montgomery*, 20 Mont. 181, 50 Pac. 416, 63 Am. St. Rep. 622, to the effect that the tendency and spirit of legislation in the northwest had been to prevent a monopoly of water.

On certiorari the United States Supreme Court, speaking through Mr. Chief Justice White, said: "The trial court recognized fully the right of the plaintiff to the volume of water actually appropriated for a beneficial purpose. It nevertheless

dismissed the complaint on the ground that there was no right under the Constitution and laws of the state of Idaho to appropriate the current of the river so as to render it impossible for others to apply the otherwise unappropriated waters of the river to beneficial uses. The court did not find it necessary to deny that power might be one of the beneficial purposes for which appropriations of water might be made, but in substance held that to uphold as an appropriation the use of the current of the river to the extent required to work the defendant's wheels would amount to saying that a limited taking of water from the river by appropriation for a limited beneficial use justified the appropriation of all the water in the river as incident to the limited benefit resulting from the use of the water actually appropriated. The court said: 'It is conceded and is beyond question, that the statute law as well as judicial authority directly protects plaintiff in all water he has actually appropriated, diverted, and used; but there is no statute, nor so far as known, any judicial rulings, protecting him in the establishment and in the use of his water wheels, as he claims to, and must, use them for the diversion of water to his land.' * * * 'It is unquestioned that what he has actually diverted and used upon his land, he has appropriated; but can it be said that all the water he uses or needs to operate his wheels is an appropriation? As before suggested, there is neither statutory nor judicial authority that such a use is an appropriation. Such use also lacks one of the essential attributes of an appropriation, —it is not reasonable.' "

It is interesting to note that neither of the three leading authorities on water right law supports the defendants in their views on the *Schodde Case*. Wiel, third edition, 337, section 313, cites it as authority that an equitable and reasonable use must be made of water, and (507, sec. 481) that a waterwheel was *per se* a wasteful method of use. Kinney, second edition, 1247, section 724, cites it as authority that unreasonable methods of diversion are not permitted. Long, second edition, 203, section 116, cites it as an authority that the right to appropriate water does not necessarily include the right to the current of

the stream to operate the appropriator's pumping machinery. Not one of them cites it as authority that the appropriator has no vested interest in his reasonable mode of diversion, or that to obtain redress he must allege and prove that by reason of the actions complained of not enough water remained to supply his appropriation even if he exhausted the last drop from the stream. They cite it, and properly so, as holding that the means of diversion must be reasonable, which means reasonably efficient and not impossibly so.

The rule in this connection is well stated as follows in Long on Irrigation, second edition, 202, 203, section 116: "The irrigator may employ any means best suited to the existing physical conditions, and all the circumstances of the case, though undoubtedly he will be required to employ reasonably economical means, so as to prevent unnecessary waste. * * * As already stated, the means of diversion employed must not be unnecessarily wasteful (*Doherty* v. *Pratt*, 34 Nev. 343, 124 Pac. 574), but when ditches and flumes are the usual and ordinary means of diverting water, parties who have made their appropriations by such means cannot be compelled to substitute iron pipes, though they will be required to prevent unnecessary waste by keeping their ditches and flumes in good repair (*Barrows* v. *Fox*, 98 Cal. 63, 32 Pac. 811)."

In *Doherty* v. *Pratt*, supra, it was said: "The rule as to reasonable and economical use of water applies as well to methods of diversion as it does to the application of the water to the land itself. * * * An appropriator has no right to run water into a swamp and cause the loss of two-thirds of a stream simply because he is following lines of least resistance. Such a method of diversion would not be an economical use of the water providing another reasonable method, under all the circumstances, could be devised to avoid such loss, even though it occasioned some additional expense to the appropriator. It is as much the province and duty of the trial court to determine whether the methods adopted for diversion are reasonable and economical under all the facts of the case as it is to determine

the amount of water required by the appropriator at the place of use."

In the present case there is no such instance as diversion by waterwheel which would prevent any other appropriations, or by running the water into a swamp so as to waste two-thirds ▮ of it. However, defendants' contention seems to be that it is equally as wasteful and improper to divert the water by means of a dam which raises the level sufficiently to make the water enter a ditch; that the water which does not actually enter the ditch is wasted as effectually as if used to turn a waterwheel or fill a swamp. If so, defendants must address themselves to the legislative branch which expressly authorized that practice in 1894 by an enactment which now appears as section 7110, Revised Codes, and which reads in part as follows: "The right to conduct water from or over the land of another for any beneficial use includes the right to raise any water by means of dams, reservoirs, or embankments to a sufficient height to make the same available for the use intended."

Plaintiff alleges that he has diverted the water by means of a wing dam of brush, rocks and dirt, and proceeds to allege that the means of diversion was at the time in question "suitable and efficient for the diversion of water," and "a reasonably adequate means of diversion and reasonably constructed and maintained" for the purpose, notwithstanding the fluctuations incidental to the reasonable and lawful use of water by all those entitled, including defendants. These are statements of ultimate facts, and causes numbered 2, 5 and 8 sufficiently state causes of action. It follows that the demurrers should have been overruled.

The next question is whether, in spite of what has been said, ▮▮ the plaintiff shall be denied relief by writ of supervisory control, and relegated to the remedy by appeal from the final judgment after trial of the other six causes of action. It is well settled that the supervisory power of this court was designed to control summarily the course of litigation in the trial courts where for any reason relief by appeal would be inadequate. (*State ex rel. City of Helena* v. *Helena Waterworks Co.,*

43 Mont. 169, 115 Pac. 200.) It is apparent from an examination of the causes of action and from the application herein, that the evidence to be adduced under the first and third varieties of causes of action, and especially the first, would be largely the same as under the causes of action here in question. Practically the only additional evidence will be with regard to the reasonable efficiency of plaintiff's diversion system; with reference to the amount of water left in the stream at plaintiff's diversion dam, the necessary proof will be even less than under the first class of causes of action. Since in our opinion these causes state facts sufficient to constitute causes of action, it is not apparent why the case should go to trial on the first six causes, and then, after appeal, be sent back for trial again on the other three. Certainly that course would be inefficient, costly and time-consuming, and would benefit no one. It is just such instances as this which under the modern theory that the courts are for the benefit of the litigants and the public interest, warrant the exercise of our power of supervisory control. Somewhat comparable is the case of *State ex rel. Lewis and Clark County* v. *District Court,* 90 Mont. 213, 300 Pac. 544, in which this court interposed a writ of supervisory control in the interest of the efficient, orderly and time-saving conduct of litigation in the trial court. No one will understand from anything said herein that this power is to be exerted where there are not, under the facts of the particular case, impelling reasons for such action.

The motion to quash and dismiss is overruled and the application for a writ of supervisory control granted. Let the writ issue.

ASSOCIATE JUSTICES ANGSTMAN and ERICKSON and HONORABLE R. M. HATTERSLEY, District Judge, sitting in place of MR. JUSTICE STEWART, disqualified, concur.

MR. JUSTICE MORRIS:

I dissent. A brief review of the decisions of this court relative to the issuance of the writ of supervisory control will amaze

the student of our jurisprudence when the exacting precision characterizing the exercise of the function by the court in earlier days is compared with the ultraliberal practice pursued at the present time. I have no objection to some modification of the strict exercise of the power as compared with, early procedure, but am of the opinion that more cogent reasons should exist than confront us in the present instance before the writ should issue.

The first instance in which the writ was issued, so far as I am able to determine, was in the case of *State ex rel. Whiteside* v. *First Judicial District Court,* 24 Mont. 539, 63 Pac. 395. The opinion of the court was by Chief Justice Brantly. The matter is approached with that judicial temperament and deliberate consideration characteristic of that great justice. At page 559, after citing a number of cases, he says: "It is hardly necessary to add that the 'superintending control' given by the constitutional provision now under consideration refers primarily to courts, not to parties or cases. Its purpose is to keep the courts themselves 'within bounds,' and to insure the harmonious working of our judicial system. It was not designed to secure the review of judgments in connection with ordinary appellate pro-jurisdiction; * * * ."

Again, in *State ex rel. City of Helena* v. *Helena Waterworks Co.,* 43 Mont. 169, 115 Pac. 200, 201, Chief Justice Brantly, speaking for the court, said: "The supervisory power—which is also appellate in its nature—was designed to control summarily the course of litigation in the inferior courts and prevent an injustice being done through a mistake of law or a willful disregard of it when there is no appeal from the erroneous order, or the relief obtained through the appeal would be inadequate."

After the *Whiteside Case* in 24 Montana was before the court, a number of important instances arose where the writ was either issued, or it was under consideration, up to and including 62 Montana Reports. The more important cases are referred to and portions thereof recited in substance as follows:

"The writ of supervisory control can be employed only in cases to remedy manifest wrongs which cannot be otherwise righted; hence a writ of supervisory control will not be granted to correct alleged errors in the decisions of a trial court that a complaint does not state a cause of action, discharging the jury, and entering judgment for defendant, the same being reviewable on motion for new trial or on appeal." (*State ex rel. Harris* v. *District Court*, 27 Mont. 280, 70 Pac. 981.)

"The writ of supervisory control is issued where the lower court is acting within its jurisdiction, but erroneously, and doing a party a gross injustice from which there is no appeal, or where an appeal would not grant a person adequate relief." (*In re Weston*, 28 Mont. 207, 72 Pac. 512.)

"The writ of supervisory control should be seldom used, and then only in the greatest emergency where palpable injustice has been done and there is no other remedy provided by the law." (*State ex rel. Morse* v. *Seventh Judicial District Court*, 29 Mont. 230, 74 Pac. 412.)

"The writ of supervisory control is seldom issued, and only when other writs and remedies are not adequate and when the threatened acts of the lower court are so arbitrary and unlawful as to be tyrannical." (*State ex rel. Heinze* v. *District Court*, 32 Mont. 579, 81 Pac. 345.)

"The writ of supervisory control issues to prevent a failure of justice, by supplying a means for the correction of manifest error committed by the trial court within jurisdiction, where there is no other adequate remedy and gross injustice is threatened." (*State ex rel. Hubbert* v. *District Court*, 54 Mont. 472, 171 Pac. 784.)

"The writ of supervisory control issues only to correct rulings made by the district court acting within jurisdiction, where there is not an appeal or the remedy by appeal cannot afford adequate relief, and gross injustice is threatened as the result of such rulings." (*State ex rel. Carroll* v. *District Court*, 50 Mont. 428, 147 Pac. 612.)

"The writ of supervisory control issues to review an action of the district court of a character so arbitrary and un-

lawful as to be tyrannical." (*State ex rel. Coleman* v. *District Court,* 51 Mont. 195, 149 Pac. 973.)

"The writ of supervisory control is in the nature of a summary appeal, and will issue only when there is no plain, speedy or adequate remedy at law by appeal or other constitutional writ." (*State ex rel. Rubin* v. *District Court,* 62 Mont. 60, 203 Pac. 860.) (The above quotations are taken from the 1925 edition of the Montana Digest under the heading "Supervisory Control.")

Whenever a petition is presented for the writ, it should not be considered by this court if any question of fact is involved. This court is an appellate court and not a fact-finding body. So far as I am able to determine from the petition in the proceeding before us, there is no remedy that our laws provide for such rights as are involved which cannot be determined in the district court subject to appeal, and any delay that may arise will not, in my opinion, deprive the plaintiffs of any right to which they can show they are entitled.